JUDGE'S COPY

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| FREDI ARMANDO GONZALEZ DELEON, | : | CIVIL NO.  1:CV-00-0702 |
| Petitioner | : | (Caldwell,J.) |
| | : | |
| v. | : | |
| | : | |
| JANET RENO, et al., | : | |
| Respondents | : | |

FILED
HARRISBURG, PA

JUN 12 2000

MARY E. O'ANDREA, CLERK
Per _____
       Deputy Clerk

**RESPONDENTS' RESPONSE TO THE PETITION FOR
WRIT OF HABEAS CORPUS**

I.  **INTRODUCTION**

Petitioner Fredi Armando Gonzalez DeLeon, a <u>pro se</u> alien,
filed the instant petition for writ of habeas corpus pursuant to
28 U.S.C. § 2241 on April 18, 2000.  Presently, Respondents
Attorney General Janet Reno and the Immigration and Naturalization
Service (INS) file their response to the habeas petition.

II.  **FACTUAL AND PROCEDURAL HISTORY**

Gonzalez DeLeon is a native and citizen of Guatamala.  (Ex. 1
at 2.)  Gonzalez DeLeon illegally entered the United States on or
about June 15, 1993.  (Ex. 2.)  On July 17, 1995, the INS adjusted
Gonzalez DeLeon's status to that of an asylee.  (Exs. 1, at 2; 2.)
Subsequently, on June 15, 1998, in the Central District of
California, Gonzalez DeLeon was convicted of assault on a foreign
official in violation of 18 U.S.C. § 112(a).[1]  (Ex. 3.)  The

_____

[1] Section 112(a) states in relevant part:

> Whoever assaults, strikes, wounds, imprisons, or
> offers violence to a foreign official, official guest,
> or internationally protected person or makes any other
> violent attack upon the person or liberty of such
> person, or, if likely to endanger his person or

district court sentenced Gonzalez DeLeon to a term of twenty-four months and three years supervised release.  (<u>Id.</u>)  On May 7, 1999, based on his criminal conviction, the INS issued Gonzalez DeLeon a Notice to Appear, charging him as being removable from the United States based on his commission of an aggravated felony.  (Ex. 2.)  <u>See</u> Immigration and Nationality Act (INA) § 237(a)(2)(A)(iii), 8 U.S.C. § 1227(a)(2)(A)(iii), and INA § 101(a)(43)(F), 8 U.S.C. § 1101(a)(43)(F).

On July 16, 1999, in support of its prior charge that Gonzalez DeLeon had been convicted of an aggravated felony, the INS alleged that he had been sentenced to more than one year incarceration for his 1998 conviction.  (<u>Id.</u>)

At a July 21, 1999, immigration hearing, Gonzalez DeLeon admitted the factual allegations in the Notice of Removal, but contended that his conviction and sentence were not final because he had pending with the Supreme Court a petition for writ of certiorari.  (Ex. 1 at 2.)  After the hearing, in a July 28, 1999, decision, the immigration judge (IJ) found that Gonzalez DeLeon's conviction was final, but did not constitute a crime of violence,

---

liberty, makes a violent attack upon his official premises, private accommodation, or means of transport or attempts to commit any of the foregoing shall be fined under this title or imprisoned not more than three years, or both.  Whoever in the commission of any such act uses a deadly or dangerous weapon, or inflicts bodily injury, shall be fined under this title or imprisoned not more than ten years, or both.  18 U.S.C. § 112(a).

and, therefore, did not fall within the definition of an aggravated felony as charged in the Notice of Removal.  (Id.)

The INS appealed the IJ's decision.[2]  (Id.)  The Board of Immigration Appeals (BIA) sustained the INS' appeal.  (Id. at 3-4.)

It also appears from the BIA's decision that on appeal Gonzalez DeLeon contended he should be granted relief under INA § 212(h).[3]  (Ex. 1 at 4.)  The BIA found Gonzalez DeLeon ineligible for § 212(h) relief because he was not a lawful permanent resident and had committed an aggravated felony.  The BIA vacated the IJ's July 28, 1999, decision and remanded the case

_____

[2] Title 8 section 1101(a)(43)(F) includes in the definition of an aggravated felony a crime of violence (as defined in section 16 of Title 18, but not including a purely political offense) for which the term of imprisonment is at least one year. 8 U.S.C. § 1101(a)(43)(F).  Title 18 section 16 defines "crime of violence" as "an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or . . . any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  18 U.S.C. §§ 16(a), (b).


[3] Under INA § 212(h), 8 U.S.C. § 1182(h), the Attorney General may, in her discretion, waive the consequences of certain deportation orders.  However, the statute provides, in relevant part, that no waiver may be granted in the case of an "alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence if either since the date of such admission the alien has been convicted of an aggravated felony or the alien has not lawfully resided continuously in the United States for a period of not less than 7 years immediately proceeding the date of initiation of proceedings to remove the alien . . . ."  8 U.S.C. § 1182(h). See e.g. Catney v. INS, 178 F.3d 190, 193-94 (3d Cir. 1999).

3

for proceedings not inconsistent with the opinion.

Subsequent to the BIA's decision, Gonzalez DeLeon filed an adjustment of status application, or Form I-485.  (Pet. at 6, ¶ C.)  A hearing was held on Gonzalez DeLeon's application for adjustment of status.  (Id. ¶ D.)

After this second hearing, the IJ granted Gonzalez DeLeon's application for adjustment of status under INA § 245(a), 8 U.S.C. 1255(a).  (Ex. 5.)  See e.g. Ruckbi v. INS, 159 F.3d 18, 19 (1st Cir. 1998).  A showing of admissibility to the United States is a statutory prerequisite to adjustment of status relief under § 245 of the INA, 8 U.S.C. § 1255(a).  Section 212(a)(2)(A)(i)(I) of the INA, the statute governing admissibility to the United States, excludes aliens who have been convicted of a crime involving moral turpitude from admissibility eligibility.  Section 212(a)(2)(A)(i)(I) states: "Except as provided in clause (ii), any alien convicted of, or who admits having committed, or who admits committing acts which constitute the essential elements of-- (I) a crime involving moral turpitude (other than a purely political offense) or an attempt or conspiracy to commit such a crime ... is inadmissible."  8 U.S.C. § 1182(a)(2)(A)(i)(I).  In this case, the IJ found Gonzalez DeLeon eligible for adjustment of status under § 245(a) because he determined that his crime was not a crime of moral turpitude, thus making him eligible for admission.

As a result of the IJ's determination that Gonzalez DeLeon was eligible for adjustment of status to that of a lawful

4

permanent resident, the IJ terminated removal proceedings and ordered him released on his own personal recognizance.  (Ex. 6.) The INS has appealed both the IJ's determination that Gonzalez DeLeon is eligible for adjustment of status, ex. 7, as well as the IJ's determination to release him, ex. 8.  The INS' appeal of the substantive portion of the IJ's order is based on its position that Gonzalez DeLeon's crime constitutes a crime of moral turpitude.  In order to stay the IJ's release order, the INS filed a document entitled "Notice of INS to Appeal Custody Redetermination," otherwise known as EOIR Form-43.  See 8 C.F.R. § 3.19 (i)(2).

In the instant petition, Gonzalez DeLeon raises several claims.  Gonzalez DeLeon contests his continued detention in INS custody on both factual and constitutional grounds.  Gonzalez DeLeon objects to the INS appealing the IJ's determination that he is eligible for adjustment of status, and asks this Court to make an independent review of the merits of his claim.

Gonzalez DeLeon's claims fail for several reasons.  First, the INS has properly stayed the implementation of the IJ's release order by filing EOIR Form-43.  Second, his continued custody does not violate the Constitution.  Third, Gonzalez DeLeon's request for this Court uphold the IJ's determination that he is eligible for adjustment of status is premature, and in any event Gonzalez

DeLeon is not eligible for adjustment of status.[4]

## III.  ARGUMENT

### A.    The INS is Properly Detaining Gonzalez DeLeon As a Result of Filing EOIR Form-43 Pending Its Appeals to the BIA

Gonzalez DeLeon's continued detention is proper.  The INS properly stayed the IJ's decision ordering Gonzalez DeLeon released on his own personal recognizance by filing EOIR Form-43. Pursuant to 8 C.F.R. § 3.19(i)(2), the filing of EOIR Form-43 automatically stays the IJ's determination to release Gonzalez DeLeon on his own personal recognizance.  See e.g. Galvez v. Lewis, 56 F. Supp. 637, 639 (E.D. Va. 1999).  Section 3.19(i)(2) states that for aliens who are subject to mandatory detention under § 236(c)(1) of the INA, 8 U.S.C. § 1226(c)(1):

> . . . any order of the immigration judge authorizing release (on bond or otherwise) shall be stayed upon the Service's filing of a . . . (Form EOIR-43) with the Immigration Court on the day the order is issued, and shall remain in abeyance pending decision of the appeal by the [BIA].  The stay shall lapse upon failure of the Service to file a timely notice of appeal in accordance with § 3.38.

8 C.F.R. § 3.19(i)(2).  Gonzalez DeLeon's status as an aggravated felon subjects him to mandatory detention until the conclusion of the removal process and the BIA rules on the INS' appeal of the IJ's determination that he is eligible for adjustment of status

---

[4] Respondents note that since filing the instant action, Gonzalez DeLeon has requested that the IJ grant him an order of removal.  (Ex. 10.)  Respondents will notify the Court of any additional events which could possibly moot Gonzalez DeLeon's claims before this Court.

under INA § 245(a), 8 U.S.C. § 1255(a).  See 8 U.S.C. §
1226(c)(1)(B), 8 U.S.C. § 1227(a)(2)(A)(iii), 8 U.S.C. §
1101(a)(43)(F).  In addition, the INS timely appealed both the
IJ's decision that he was eligible for adjustment of status, and
the IJ's determination to release Gonzalez DeLeon on his own
recognizance.  Thus, Gonzalez DeLeon's detention is proper.

**B.    Gonzalez DeLeon's Detention Is Constitutional**

In the petition, Gonzalez DeLeon claims that he is in INS
custody in violation of his right to due process.  In the event
the Court construes Gonzalez DeLeon's claim regarding the
impropriety of his continued detention as encompassing a
constitutional claim concerning the legality of mandatory
detention, Respondents address those potential arguments below.

The Seventh Circuit in Parra v. Perryman, 172 F.3d 954 (7th
Cir. 1999), was the first appellate court to consider and uphold
the constitutionality of mandatory detention pending proceedings
for criminal aliens under § 236(c) of the INA, 8 U.S.C. § 1226(c).
Subsequently, the majority of courts that have addressed the issue
have reached the same result.  See Richardson v. Reno, 162 F.3d
1338, 1364 n.119 (11th Cir. 1998), vacated on other grounds, 119
S. Ct. 2016 (1999); Okeke v. Pasquarell, 80 F. Supp.2d 635 (W.D.
Tex. Jan. 11, 2000); Reyes v. Underdown, 73 F. Supp.2d 653 (W.D.
La. Nov. 3, 1999); Jacques v. Reno, 73 F. Supp.2d 477, 483 (M.D.
Pa. Oct. 29, 1999) (McClure, J.); Sierra-Tapia v. Reno, __ F.
Supp.2d __, 1999 WL 803898 (S.D. Cal. Sept. 30, 1999) (attach A);

7

<u>Alikhani v. Fasano</u>, 70 F. Supp.2d 1124 (S.D. Cal. July 19, 1999);
<u>Edwards v. Blackman</u>, 48 F. Supp.2d 477 (M.D. Pa. 1999), vacated on
other grounds, No. 99-3674, (Order dated December 6, 1999 3d Cir.)
(attach B); <u>Galvez</u>, 56 F. Supp.2d at 645; <u>Diaz-Zaldierna v.
Fasano</u>, 43 F. Supp.2d 1114 (S.D. Cal. 1999). <u>But</u> <u>see</u> <u>Chukwuezi v.
Reno</u>, 3:CV-99-2020, Mem. Op. (May 16, 2000 M.D. Pa.) (Vanaskie,
C.J.) (attach C); <u>Bouayad v Holmes</u>, 74 F. Supp.2d 471 (E.D. Pa.
1999).

Detaining criminal aliens is part of the removal process, not
an end result. Section 236(c) is one of several pieces of
legislation collectively designed to accelerate the removal
process for criminal aliens. The Illegal Immigration Reform and
Immigrant Responsibility Act of 1996 (IIRIRA) established a
framework designed to effect a net increase in removal orders
entered against criminal aliens. Through IIRIRA's provisions,
Congress not only mandated the detention of criminals pending
removal proceedings, but also took away the Attorney General's
discretionary authority to forgo the removal of aggravated felons,
eliminated judicial review, and set a 90-day time limit by way of
instruction to the INS for physical removal after a final order is
entered. <u>See</u> 8 U.S.C. §§ 1101(f)(3) and (8), 58(b)(2)(B), 1226(c)
and (e), 1229b(a)(3), (b)(1)(B), (C), (2)(C), (D), 1229c(a)(1),
1231(a), (b)(1)(A), (C), 1231(a)(2), 1252(a)(2)(C) (Supp. III
1998).

Congress implicitly recognized that the curtailment of

8

individual liberty interests was necessary to effect a net increase in removal orders against criminal aliens.  That is, while the IIRIRA demands the detention of all criminal aliens from start to finish of the administrative removal process without an individual assessment on dangerousness and flight risk, it does so based on the theory that such limitation is necessary to ensure a more effective and credible removal process generally.  See H.R. Rep. No. 104-469(I) (1996), available in 1996 WL 168955; 142 Cong. Rec. S3328, 1996 WL 174902 (daily ed. Apr. 15, 1996) (statement of Sen. Abraham) ("These provisions collectively will allow us to dramatically increase the number of criminal aliens who are deported.") (emphasis added).

Respondents do not dispute that § 236(c) is subject to some level of substantive due process review.[5]  See Fiallo v. Bell, 430 U.S. 787, 793 n.5 (1977).  Because of the "plenary powers"

---

[5] The Attorney General's implementing regulations establish three layers of administrative review over custody determinations pending removal proceedings.  The alien initially obtains automatic custody review by the INS District Director and, if the decision is unfavorable, the alien may seek redetermination before an IJ and ultimately appeal to the BIA.  8 C.F.R. §§ 3.19(a), 236.1(d).  In § 236(c) cases, the administrative agency has the jurisdiction, pursuant to 8 C.F.R. § 3.19(h)(2)(ii), to determine whether the alien in custody actually falls within a category of criminal aliens subject to interlocutory detention pending removal proceedings.  See Matter of Joseph, Int. Dec. 3398, 1999 WL 339053 (BIA 1999)(attach D).  If the alien does fall within the interlocutory detention provision, then there is no authority to entertain a request for release on bond (unless the alien is eligible for Witness Protection Program benefits).  Id.

doctrine, the proper standard of review here is a deferential rational-relation standard, under which Section 1226(c) is constitutional so long as it is "rationally" related to a "legitimate" government interest. See Reno v. Flores, 507 U.S. 292, 300-01, 306 (1993); Carlson v. Landon, 342 U.S. 524, 540-41 (1952) (upholding INS detention that was not clearly "without reasonable foundation").

The principle of judicial deference to legislative choices is magnified in the immigration context. See Fiallo, 430 U.S. at 792; Harisiades v. Shaughnessy, 342 U.S. 580, 588-589 (1952). That basis for judicial caution applies with equal force in the immigration detention context. See Wong Wing v. United States, 163 U.S. 228, 234 (1896). Releasing an alien may also jeopardize the public safety and compromise the government's enforcement objectives. Carlson, 342 U.S. at 538.

The most appropriate characterization of liberty interest at stake is the interest of a deportable criminal alien in being released pending removal proceedings. The private interest implicated by INA § 236(c)'s detention requirement "is not liberty in the abstract, but liberty in the United States by someone no longer entitled to remain in this country." Parra, 172 F.3d at 958. Courts are required to adhere to the prudent course of looking to the concrete facts of a case to determine what right is at issue. See Washington v. Glucksberg, 521 U.S. 702, 722-24 (1997).

The interest of the alien at stake in § 236(c) cases is a
non-fundamental interest in being released pending proceedings,
not in an individualized hearing on the question of whether he
will be released.  As the Second, Fifth, and Seventh Circuit
Courts have recognized, a deportable alien does not possess the
same "liberty" as a citizen.  See Zadyvdas v. Underdown, 185 F.3d
279, 289 (5th Cir. 1999); Parra, 172 F.3d at 958; Doherty v.
Thornburgh, 943 F.2d 204, 209-10 (2d Cir. 1991).  In a certain
sense, deportable criminal aliens in removal proceedings possess
no "right to come and go at will."  See Flores, 507 U.S. at 302.
The reason is two-fold: (1) release on bond has always been a
privilege and never a matter of right or entitlement and (2)
aliens are subject to the will of Congress when it comes to
matters associated with their continued presence within our
society.  See Flores, 507 U.S. at 305-06; Harisiades, 342 U.S. at
586-87.

Consequently, although a criminal alien's physical freedom is
being infringed temporarily during his removal proceedings, he has
not been unlawfully deprived of any "fundamental liberty interest"
in the constitutional sense.  See Parra, 172 F.3d at 958; see also
Flores, 507 U.S. at 306, Carlson, 342 U.S. at 537, 540-41;
Doherty, 943 F.2d at 208-11.  Because § 236(c) does not implicate
a fundamental right, the scope of review is rational basis review.
See Flores, 507 U.S. at 306.

Section 236(c) is a reasonable exercise of congressional

power, as it clearly furthers a legitimate governmental purpose.
The statute seeks to prevent clearly deportable criminal aliens
with no realistic hope of relief from removal from absconding or
committing further criminal acts during proceedings to effect
their removal.  Preventing danger to the community and flight have
long been considered legitimate regulatory goals.  See, e.g.,
United States v. Salerno, 481 U.S. 739, 748-49 (1987); Schall v.
Martin, 467 U.S. 253, 251 (1984); Bell v. Wolfish, 441 U.S. 520
(1979); Carlson, 342 U.S. at 534.  These goals have been paramount
among the immigration enforcement concerns of Congress and the
Attorney General over the past decade, with mounting emphasis in
the past three years as the problems of widespread recidivism and
abscondment have come increasingly to light.

A 1995 report of the Senate Governmental Affairs Committee
observed that "[i]n New York, for example, in fiscal year 1993,
out of 1695 [orders to surrender for deportation] sent to criminal
and non-criminal aliens, 1486, or 87.7 percent failed to
surrender.  Also, in New York, there were $2.4 million in bonds
breached in fiscal year 1993.").  S. Rep. No. 104-48, 1995 WL
170285 (Apr. 7, 1995) (emphasis added)(attach E); see also id.
("Through 1992, nearly 11,000 criminal aliens convicted of
aggravated felonies (which are particularly serious crimes) failed
to appear for deportation hearings. . . .") (emphasis added).

There can be no question that removing deportable criminal
aliens from the United States, and preventing them from absconding

or committing further crimes in the process, are legitimate and reasonable goals.  See, e.g., Salerno, 481 U.S. at 747; Bell v. Wolfish, 441 U.S. 520 (1979).  Nor is there any doubt, in light of the disturbing rates of abscondment and recidivism discussed above, that the detention requirement rationally advances these objectives, or that a rational relationship exists between the "aggravated felon" classification and danger to the community and flight risk.  Hence, § 236(c)(2) rests on a legitimate basis, and Gonzalez DeLeon's challenge must fail.  See Flores, 507 U.S. at 306; Fiallo, 430 U.S. at 794-95.

Section 236(c) also does not violate Gonzalez DeLeon's procedural due process rights.  In assessing the legitimacy of any procedural due process claim, great judicial deference should be given to Congress' determination of what process is due.  See Weiss v. United States, 510 U.S. 163, 176-77 (1994).  The due process analysis set out in Mathews v. Eldridge, 424 U.S. 319, (1976), requires the court "to evaluate the private interest, the probability of error (and the effect of additional safeguards on the rate of error), and the government's interest in dispensing with those safeguards, with a thumb on the scale in favor of the statute's constitutionality."  Parra, 172 F.3d at 957 (emphasis added).

As the Seventh Circuit correctly observed, criminal aliens covered by § 236(c) do not have any constitutional "right" or "liberty interest" in avoiding detention pending removal

proceedings, because by virtue of their criminal conduct and convictions they have "forfeited any legal entitlement to remain in the United States." See Parra, 172 F.3d at 958. Consequently, "[t]he private interest here is not liberty in the abstract, but [merely] liberty in the United States by someone who is no longer entitled to remain in this country." Id.

The Parra court's reasoning applies in this case. Because Gonzalez DeLeon is properly in the INS' jurisdiction and does not dispute the material facts underlying the criminal removal charges, the Court should significantly reduce the weight accorded his private interests in evaluating the due process claim. See Parra, 172 F.3d at 958.

Moreover, on the weight of the Government's interest, the Court may not substitute its judgment for the informed decisions of Congress. Cf. Weiss, 510 U.S. at 176-77. Parra's reasoning is legally sound:

> The Supreme Court held in United States v. Salerno, 481 U.S. 739 (1987), that pretrial detention in criminal prosecutions (a parallel to pre-removal detention) comports with the Constitution even though the private interest is greater, the likelihood of error must be deemed significant given the prosecutor's high burden at a criminal trial, and the public interest is less (for the skip rate on bond in criminal prosecutions is well under 90%). Given the sweeping powers Congress possesses to prescribe the treatment of aliens, see Fiallo v. Bell, 430 U.S. 787, 792 (1977), the constitutionality of §1226(c) is ordained.

Parra, 172 F.3d at 958. For these reasons, the Court should conclude that § 236(c) does not violate Gonzalez DeLeon's

14

procedural due process rights.

### C. Gonzalez DeLeon's Request to Have This Court Review His Claim that His Conviction Does Not Constitute a Crime of Moral Turpitude Is Premature and, In Any Event, Fails on the Merits

Gonzalez DeLeon asks this Court to hear his claim that the IJ correctly determined that his conviction does not constitute a crime of moral turpitude and that he is eligible for adjustment of status. Gonzalez DeLeon is premature in requesting this Court to review the IJ's determination. The INS is currently appealing the IJ's decision to the BIA and should be permitted to follow through with its appeal. Gonzalez DeLeon will have an opportunity to present his arguments to the BIA. Moreover, Gonzalez DeLeon's § 112(a) conviction constitutes a crime of moral turpitude. Gonzalez DeLeon assaulted a foreign official. Section 112(a) requires the assault to be violent in nature, and his victim was a foreign official, a protected category of victims. Both factors make Gonzalez DeLeon's conviction one "contrary to the accepted rules of morality and the duties owed between persons or to society in general . . . ." Nguyen v. Reno, ___ F.3d ___, 2000 WL 566748 (1st Cir. May 16, 2000)(attach F). Thus the BIA will affirm the INS' appeal and the petition should be dismissed.

V. **CONCLUSION**

    For the aforementioned reasons, Gonzalez DeLeon's petition for writ of habeas corpus should be denied.

                                    Respectfully submitted,

                                    DAVID M. BARASCH
                                    United States Attorney


                                    DULCE   DONOVAN
                                    Assistant U.S. Attorney
                                    228 Walnut Street
                                    P.O. Box 17108-1754
Dated: June 12, 2000               Harrisburg, PA  17108

# Attachment A

Not Reported in F.Supp.2d
(Cite as: 1999 WL 803898 (S.D.Cal.))
▷

Elena SIERRA-TAPIA, Petitioner,
v.
Janet RENO, Attorney General of the United
States et al., Respondents.

No. 99-CV-986 TW(RBB).

United States District Court, S.D. California.

Sept. 30, 1999.

Jan Joseph Bejar, San Diego, California, for
Petitioner.

Samuel W. Bettwy, United States Attorney, San
Diego, California, for Respondent.

AMENDED ORDER DENYING PETITION FOR
WRIT OF HABEAS CORPUS; TERMINATING
CASE

WHELAN, J.

I. Introduction

**\*1** On May 13, 1999 Petitioner Elena Sierra-Tapia
("Petitioner"), proceeding through counsel, filed a
petition for writ of habeas corpus pursuant to 28
U.S.C. § 2241. Petitioner is currently being detained
by the Immigration and Naturalization Service
("INS") pursuant to the mandatory detention
provision of Section 236(c) of the Immigration and
Naturalization Act ("INA") [8 U.S.C. § 1226(c) ].
Petitioner seeks an order requiring the INS to
discharge her from custody and to parole her into the
United States during the pendency of her removal
proceedings. For the reasons expressed herein, the
court DENIES the petition.

II. Background [FN1]

> FN1. The facts set forth in these paragraphs are
> undisputed and are taken largely from the petition
> and from the exhibits attached to the Government's
> return. The court also takes judicial notice of the
> records in the criminal case involving Petitioner,
> United States v.. Sierra Tapia, No. 98-CR-1347
> K(RBB) (S.D.Cal. Mar. 25, 1998).

Petitioner is a 49-year old native and citizen of
Mexico who became a lawful permanent resident on
June 20, 1990. At approximately 7:00 AM on March
25, 1998, Petitioner and her 10-year old daughter
entered the United States from Mexico at the Tecate,
California Port of Entry driving a 1977 Pontiac
Ventura. Petitioner was the driver and her daughter
the front-seat passenger of the vehicle.

While waiting at the primary checkpoint, a border
patrol narcotics agent noticed that Petitioner appeared
nervous and frightened. The officer referred the
vehicle to secondary inspection where a search of the
vehicle revealed 42.5 pounds of a green leafy
substance that field tested positive for marijuana.
Petitioner was taken into custody the same day and
charged with two counts of knowingly and
intentionally importing marijuana and possessing
marijuana with intent to distribute. Petitioner was
paroled into the United States during the pendency of
her prosecution.

On October 6, 1998, a jury convicted Petitioner of
both counts and the court sentenced her to a term of
imprisonment. Petitioner was released on January 29,
1999 into the custody of the INS. The INS
subsequently detained Petitioner and charged her
with inadmissibility under INA § 212(a)(2)(A)(i)(II)
[8 U.S.C. § 1182(a)(2)(A)(i)(II) ] on the basis of her
controlled substance conviction.

The INS is currently detaining Petitioner without
bond pursuant to the mandatory detention provisions
of INA § 236(c) [8 U.S.C. § 1226(c) ]. Petitioner
contends that her continued detention is
unconstitutional and seeks an order requiring the INS
to discharge her from custody pending the outcome
of removal proceedings.

III. Subject Matter Jurisdiction

It is well-established that a federal court cannot
reach the merits of any dispute until it confirms its
own subject matter jurisdiction. Steel Co. v. Citizens
for a Better Environ., 523 U .S. 83, ___, 118 S.Ct.
1003, 1013, 140 L.Ed.2d 210 (1998). "Without
jurisdiction the court cannot proceed at all in any
cause. Jurisdiction is power to declare the law, and
when it ceases to exist, the only function remaining
to the court is that of announcing the fact and
dismissing the cause." Id. (quoting Ex parte
McCardle, 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264
(1868)). Accordingly, federal courts are under a
continuing duty to confirm their jurisdictional power

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
(Cite as: 1999 WL 803898, *1 (S.D.Cal.))

Page 2

and are "obliged to inquire sua sponte whenever a doubt arises as to [its] existence ..." Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977) (citations omitted).

**\*2** The INS commenced removal proceedings against petitioner on January 29, 1999. Judicial review is therefore governed by the permanent jurisdictional provisions of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub.L. No. 104-132, 110 Stat. 3009-546 ("IIRIRA"); IIRIRA §§ 309(c)(1) & (a).

Respondent contends the court lacks jurisdiction to hear the writ pursuant to what the Supreme Court recently coined as "the unmistakable zipper clause" of INA § 242(b)(9) [8 U.S.C. § 1252(b)(9) ]. See Reno v. American-Arab Anti- Discrimination Committee, 525 U.S. 471, _____, 119 S.Ct. 936, 943, 142 L.Ed.2d 940 (1999) (dicta). That statute provides:

(9) Consolidation of questions for judicial review
Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section.
8 U.S.C. § 1252(b)(9). This court had occasion to interpret this statute in Maldonado v. Fasano, No. 99-CV-880 TW, 1999 WL 343423 (S.D.Cal. May 21, 1999), where the court held that INA § 242(b)(9) eliminated § 2241 habeas corpus jurisdiction for resident aliens challenging final orders of removal. See id. at \*4-5 (emphasis added). The court held that "[t]o the extent judicial review is available under the immigration statutes, or is compelled by the constitution, such review exists only in the court of appeals ." Id. at \*5.

Maldonado did not address the specific issue now before the court-whether the permanent jurisdictional rules of INA § 242 repealed § 2241 habeas jurisdiction for aliens challenging detention pending removal. In dicta, the decision suggested that INA § 242(b)(9) "may divest federal courts of jurisdiction to review interim administrative determinations, such as agency actions concerning bail and parole," id. at \*4, but did not have occasion to resolve the issue. In Richardson v. Reno, 180 F.3d 1311 (11th Cir.1999),

the Eleventh Circuit recently resolved this question against jurisdiction, holding that INA § 242(b)(9) completely revoked district court § 2241 habeas jurisdiction for all challenges, including challenges to detention pending removal.

The court agrees with Richardson and with its previous statements in Maldonado that the plain language of INA § 242(b)(9) divests district courts of § 2241 habeas jurisdiction over matters concerning executive detention. Finding that the statute applies, however, does not necessarily end the inquiry. With respect to congressional and executive control over immigration, the Supreme Court has stated:

The power to exclude aliens, being a power affecting international relations, is vested in the political departments of the government, and is to be regulated by treaty or by act of Congress and to be executed by the executive authority according to regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the constitution.
**\*3** Hampton v. Mow Sun Wong, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904 n. 21, 48 L.Ed.2d 495 (1976) (quoting Fong Yue Ting v. United States, 149 U.S. 698, 713, 13 S.Ct. 1016, 1022, 37 L.Ed. 905 (1893)) (emphasis added). Thus, even where Congress does not authorize judicial review of actions concerning immigration, Congressional and executive power over immigration "is, of course, subject to judicial intervention under the paramount law of the constitution." Carlson v. Landon, 342 U.S. 524, 537, 72 S.Ct. 525, 533, 96 L.Ed. 547 (1952) (internal quotations omitted).

The question of whether INA § 242(b)(9) divests district courts of § 2241 habeas jurisdiction is a difficult one, implicating countless constitutional issues including the extent of Congressional authority over immigration and the jurisdiction over the lower federal courts. Despite the language of INA § 242(b)(9), statements in Fong Yue Ting and other Supreme Court decisions suggest that district courts may ultimately retain some limited constitutional habeas jurisdiction to challenge the validity of INS detention. The court will therefore examine the merits of Petitioner's arguments to see if she raises any colorable constitutional claims.

IV. Discussion

Petitioner does not dispute that the mandatory detention provisions of INA § 236(c) apply to her case and require the INS to detain her without bond or parole. [FN2] Her sole contention is that the denial of an individualized bond determination violates principles of substantive and procedural Due Process.

FN2. Petitioner does not dispute that the Transition Period Custody Rules (TPCR) do not apply to her since the INS commenced removal proceedings after October 9, 1998.

In response, Respondent argues that the Petitioner's arguments lack merit because (1) Petitioner has no constitutional right to be paroled into the United States because she was apprehended upon entry to the United States; and because (2) even if the court reaches Petitioner's constitutional challenge, INA § 236(c) is constitutional. The court will address each of the parties' arguments in turn.

a. Petitioner's Status as an "Arriving" Alien

Respondent argues that Petitioner has no constitutional right to be paroled into the United States pending her removal proceedings because the federal government took her into custody as an alien entering the United States. Respondent argues that Petitioner's status as an "arriving" alien significantly diminishes her constitutional status and eliminates any constitutional entitlement she may have had to an individualized bond determination. In response, Petitioner argues that she should not be considered an "arriving" alien because she had a long period of residence in the United States prior to her March 1998 arrest.

Petitioner's arguments are undermined by the Supreme Court's decision in Shaughnessy v. United States ex rel. Mezei, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953) ("Mezei" ). The alien in Mezei lived in the United States for 25 years until he took a 19-month trip to Hungary to visit a dying relative. Upon return to the United States, the Attorney General detained and confined him and sought to exclude him as a threat to national security. When no country would take him, the government confined him at Ellis Island for over 21 months. Mezei argued that his continued detention violated due process.

*4 The Supreme Court rejected these arguments by drawing the sharp distinction between "aliens who have once passed through our gates, even illegally," who are entitled to Due Process protections, and those "on the threshold of initial entry," who "stand[ ] on a different footing." Id. at 212, 73 S.Ct. at 629. Those in the latter category, the Court declared, are entitled to virtually no Due Process protection. "Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." Id. (quoting United States ex rel. Knauff v. Shaughnessy, 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed.2d 317 (1950)). As for Mezei's continued detention at Ellis Island, the Court held that it did not "deprive him of any statutory or constitutional right." Id. at 215, 73 S.Ct. at 631.

More recently, the Ninth Circuit reaffirmed Mezei and held that an alien entering the United States had no constitutional right to be free from detention, even for an extended period of time. Barrera-Echavarria v. Rison, 44 F.3d 1441, 1449 (9th Cir.1995) (en banc). The court noted the long line of Supreme Court cases recognizing the validity of detaining aliens pending deportation and stated that cases such as Mezei suggest that "excludable aliens simply enjoy no constitutional right to be paroled into the United States, even if the only alternative is prolonged detention." Id. at 1450. [FN3]

FN3. The Ninth Circuit in Barrera-Echavarria suggested that the Mezei holding and reasoning may not apply to cases of "indefinite" or "permanent" detention. 44 F.3d at 1450. This case, however, does not implicate concerns of indefinite detention since there is no suggestion that Petitioner cannot return to Mexico if the INS orders her removed from the United States.

Although recent amendments to the federal immigration statutes have eliminated the statutory distinction between "exclusion" and "deportation," the constitution continues to draw a distinction between resident aliens and aliens who seek admission to the United States. [FN4] Under Mezei, the government may automatically confine those in the latter category, such as Petitioner, without offending the constitution.

FN4. The Supreme Court in Rosenberg v. Fleuti, 374 U.S. 449, 462, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963) held that "an innocent, casual, and brief excursion" by a resident alien into a foreign country would not convert the returning alien into an "excludable" alien under the INA. However, the BIA recently held that Congress legislatively overruled

Not Reported in F.Supp.2d

(Cite as: 1999 WL 803898, *4 (S.D.Cal.))

the Fleuti doctrine when it enacted IIRIRA. In re Collado, Int. Dec. 3333, 1998 WL 95929 (BIA 1998).

Although it is unclear how long Petitioner was in Mexico before attempting to reenter the United States, it is undisputed that Petitioner was apprehended at the border in March 1998 while attempting to smuggle 42.5 pounds of marijuana into the United States. Petitioner's apprehension for a criminal act at the border transmuted her constitutional status from a permanent resident into an arriving alien. [FN5] The government can therefore confine Petitioner without a bond hearing notwithstanding the fact that she previously enjoyed a long period of permanent residence in the United States. Mezei, 345 U.S. at 215, 73 S.Ct. at 631.

FN5. Petitioner has been under the custody and supervision of the federal government continuously since her March 1998 arrest notwithstanding that she was paroled into the United States during criminal proceedings. Cf. Carlson v. Landon, 342 U.S. 524, 547, 72 S.Ct. 525, 538, 96 L.Ed. 547 (1952) ("When a prisoner is out on bond he is still under court control, though the bounds of his confinement are enlarged.").

b. Petitioner's Constitutional Challenge to INA § 236(c)

Even assuming Petitioner enjoyed the full Due Process protections afforded resident aliens, the court nonetheless finds that her constitutional challenge to the mandatory detention provisions of INA § 236(c) lacks merit. Petitioner argues that "[i]n creating an irrebuttable presumption that all non-citizens with certain convictions require mandatory detention, the INS is depriving individuals of their liberty in violation of substantive and procedural due process." (See Pet. at 7). Respondent counters by arguing that Petitioner has failed to cite any authority supporting her position that she is constitutionally entitled to bail pending removal proceedings. (See Return at 7).

1. Substantive Due Process--Legal Standard

*5 Federal courts have long recognized that the Due Process Clause prevents governmental interference with those fundamental rights "implicit in the concept of ordered liberty." Palko v. Connecticut, 302 U.S. 319, 325-26, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). The simplest example of such a right is the freedom

from bodily restraint, a right so fundamental that it "has always been at the core of the liberty protected by the Due Process Clause ..." Foucha v. Louisiana, 504 U.S. 71, 80, 118 S.Ct. 1780, 1785, 118 L.Ed.2d 437 (1992); accord United States v. Salerno, 481 U.S. 739, 750, 107 S.Ct. 2095, 2103, 95 L.Ed.2d 697 (1989) (noting "the individual's strong interest in liberty."). Once government action infringes upon a "fundamental" right, the court will strike down the offending act or statute unless the infringement is narrowly tailored to serve a compelling governmental interest. Reno v. Flores, 507 U.S. 292, 302, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993) ("Flores" ). If the right at issue is not "fundamental," however, the court will uphold the act or statute so long as it is rationally related to a legitimate governmental interest. Washington v. Glucksberg, 521 U.S. 702, 728, 117 S.Ct. 2258, 2271, 138 L.Ed.2d 772 (1997); Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 487-88, 75 S.Ct. 461, 464, 99 L.Ed. 563 (1955).

The Supreme Court has admonished federal courts that a due process analysis must always "begin with a careful description of the asserted right, for "[t]he doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field." ' Flores, 507 U.S. at 302, 113 S.Ct. at 1449 (quoting Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992)) (alteration in original).

2. Defining the Right

Petitioner contends that INA § 236(c) is unconstitutional, both on its face and as applied to her, because it implicates her most basic and vital right to freedom from physical restraint or confinement. (See Pet. at 8-11). She contends that mandatory detention deprives her of the opportunity to show that she is neither a flight risk nor a danger to the community.

The court disagrees with Petitioner's definition of her alleged liberty interest and finds her situation analogous to that presented in Parra v. Perryman, 172 F.3d 954 (7th Cir.1999). The alien in Parra was convicted of an aggravated felony and detained by the INS pending removal from the United States. Parra, like Petitioner, brought a § 2241 habeas action contending that the mandatory detention provisions of INA § 236(c) violated his right to liberty guaranteed by Due Process. The court rejected this

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

* Not Reported in F.Supp.2d
(Cite as: 1999 WL 803898, *5 (S.D.Cal.))

Page 5

argument, stating:

> Persons subject to § 1226(c) have forfeited any legal entitlement to remain in the United States and have little hope of clemency. Before IIRIRA bail was available to persons in Parra's position as a corollary to the possibility of discretionary relief from deportation; now that this possibility is so remote, so too is any reason for release pending removal. Parra's legal right to remain in the United States has come to an end. An alien in Parra's position can withdraw his defense of the removal proceeding and return to his native land, thus ending his detention immediately. He has the keys in his pocket. A criminal alien who insists on postponing the inevitable has no constitutional right to remain at large during the ensuing delay, and the United States has a powerful interest in maintaining the detention in order to ensure that removal actually occurs.

*6 Parra, 172 F.3d at 958 (emphasis in original). Since Parra had virtually no chance of remaining in the United States at the conclusion of his removal proceedings, the court held that Parra's due process interest was not "liberty in the abstract, but liberty in the United States by someone no longer eligible to live at liberty in this country but eligible to live at liberty in his native land." Id. (emphasis in original). [FN6]

> FN6. The Seventh Circuit also noted that Parra's case did not present problems of indefinite confinement or detention since the alien's native land, Mexico, accepts return of its citizens. Parra, 172 F.3d at 957.

The court finds the reasoning of Parra persuasive. The decision recognizes that detained aliens with little chance of remaining legally in the United States lack a liberty interest cognizable under the Due Process Clause. The strength of an alien's due process liberty interest therefore depends on the likelihood that the alien will be permitted to legally remain in the United States after the conclusion of removal proceedings. Where an alien commits an aggravated felony, she renders herself immediately removable from the United States and forfeits any discretionary form of relief from removal.

Here, Petitioner has made no showing that she is likely to remain in the United States before the close of her removal proceedings. A jury found Petitioner guilty of knowingly importing 42.5 pounds of marijuana into the United States-an extremely serious

controlled substance offense that easily qualifies as an "aggravated felony" under the INA. See 8 U.S.C. § 1101(a)(43)(B) ("The term 'aggravated felony' means ... illicit trafficking in a controlled substance ..."); 21 U.S.C. § 812, Sch. I(c)(10) (definition of controlled substance includes marijuana); 21 U.S.C. § 802(16); cf. United States v. Estrada-Torres, 179 F.3d 776 (9th Cir.1999) (holding that violation of California statute prohibiting importation of marijuana was properly classified as "aggravated felony" under INA § 101(a)(43), allowing for sentencing enhancement). Petitioner's felony conviction thus renders her ineligible for the only form of discretionary relief she seeks, "cancellation" of removal under INA § 240A [8 U.S.C. § 1229b]. See 8 U.S.C. §§ 1229b(a), 1229b(b)(1)(C) (cancellation of removal unavailable to aggravated felons). [FN7] Even assuming Petitioner was eligible for some form of discretionary relief, she has made no showing that she will likely receive it, particularly in light of the serious nature of the crime for which she was convicted . [FN8] The court therefore holds that Petitioner's Due Process liberty interest is far less from "fundamental," and is no stronger than that of the alien in Parra.

> FN7. Although the INS initially charged Petitioner with removability due to her controlled substance conviction, it appears that the INS has realized that her marijuana importation offense also qualifies as an "aggravated felony" under the INA. (See Pet. at 10:16-19). The immigration judge's April 21, 1999 notes indicate doubt as to whether Section 240A cancellation is available to Petitioner. (See Resp. Exh. 22).

> FN8. Petitioner also contends that she seeks to avoid removal from the United States by seeking protection of Deferral of Removal pursuant to the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment. (See Traverse at 4:14-18). Petitioner fails, however, to offer any specific factual allegations suggesting that she may qualify for this form of relief from removal.

### 3. Applying the Scrutiny

Having found that Petitioner has no fundamental right to liberty within the United States during her removal proceedings, the court must apply the more deferential "rational basis" test. Williamson, 348 U.S. at 487-88, 75 S.Ct. at 464. Rational basis requires even more deference where, as here, the challenged

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

statute concerns immigration. The Supreme Court has bestowed Congressional immigration statutes with the strongest presumption of constitutional validity. In no other area of law has the Court employed more sweeping and unequivocal language suggesting that legislative and executive authority over immigration is virtually plenary. The Court has stated that matters involving immigration are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference. Harisiades v. Shaughnessy, 342 U.S. 580, 588-89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952). The principle that formulation of policies pertaining to immigration is entrusted exclusively to Congress "has become about as firmly embedded in the legislative and judicial tissues of our body politic as any aspect of our government." Galvan v. Press, 347 U.S. 522, 531, 74 S.Ct. 737, 743, 98 L.Ed. 911 (1954); accord Flores, 507 U.S. at 305-306, 113 S.Ct. at 1449 ("[T]he responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government. Over no conceivable subject is the legislative power of Congress more complete.") (internal citations omitted). These oft-repeated general principles guide judicial review of any immigration statute [FN9] and require the court to uphold the statute so long as it "meet[s] the (unexacting) standard of rationally advancing some legitimate governmental purpose ..." Id. at 306, 113 S.Ct. at 1449.

FN9. The Supreme Court has only twice struck down congressional immigration statutes. See INS v. Chadha, 462 U.S. 919, 103 S .Ct. 2764, 77 L.Ed.2d 317 (1983) (congressional statute authorizing one House of Congress to "legislatively veto" Attorney General's decision to suspend deportation in individual cases violated separation of powers); Wong Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (congressional statute subjecting Chinese alien illegally residing in the United States to imprisonment and hard labor held unconstitutional where statute did not require judicial finding of guilt).

*7 INA § 236(c) clearly passes constitutional muster for at least three reasons. First, Congress could rationally have believed that aliens who commit aggravated felonies present a danger to the community. As one court noted, aliens involved in drug trafficking pose a significant threat the society's health and welfare. Diaz-Zaldierna v. Fasano, 43

F.Supp.2d 1114, 1120 (S.D.Cal.1999) (Moskowitz, J.).

Second, Congress could rationally believe that aliens facing removal are likely to abscond if released on bail. The Parra decision, for example, cited Department of Justice statistics indicating that 90% of aliens facing removal from the United States abscond once released on bail. 172 F.3d at 956 (citing 62 Fed.Reg. 10,312, 10,323 (1997)). The Seventh Circuit indicated that this rate exceeds the abscond rate for criminal defendants released on bond. Id. at 958.

Third, Congress could rationally have concluded that denying bail to an alien certain to face removal from the United States eliminates the incentive to indefinitely prolong removal proceedings. An alien released on bail with little chance of remaining in the United States has a strong incentive to delay administrative proceedings by filing frivolous motions and appeals. Placing such an alien in mandatory detention reduces this incentive, furthering congressional policy of expeditiously removing criminal aliens from the United States.

The court therefore concludes that INA § 236(c) comports with Due Process and does not offend the constitution. [FN10]

FN10. Since Petitioner lacks a substantive due process liberty interest, her procedural due process arguments require no comment. See American Manuf. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, ____, 119 S.Ct. 977, 989, 143 L.Ed.2d 130 (1999) (citations and internal quotation marks omitted) ("The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property or liberty. Only after finding the deprivation of a protected interest do we look to see if the State's procedures comport with due process."); Sargeant v. Dixon, 130 F.3d 1067, 1070 (D.C.Cir.1997) ("Absent an underlying property or liberty interest, therefore, one has no entitlement to procedural due process and hence no 'right to be heard.' ").

4. Applicability of The Salerno Framework

Petitioner urges the court to apply the Due Process framework for pretrial criminal detention articulated by the Supreme Court in United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Salerno involved a challenge to provisions of

Not Reported in F.Supp.2d
(Cite as: 1999 WL 803898, *7 (S.D.Cal.))

the Bail Reform Act that authorized pretrial detention of a criminal defendant upon a showing that the defendant posed a danger to the community. The Court held that evaluating the statute's constitutionality required a two step process. First, the court must determine whether the statute advances a regulatory or punitive purpose. Id. at 746, 107 S.Ct. at 2101. Second, if the statute is deemed regulatory it will be upheld unless it appears "excessive" in relation to its purpose. Id.

Applying this framework to the Bail Reform Act, the Court upheld the statute reasoning that it had a regulatory purpose and was narrowly tailored to prevent criminal defendants from committing additional crimes. The Court emphasized that the statute included numerous procedural safeguards, including a "full- blown adversary hearing" that required the government to show by "clear and convincing evidence" that a criminal defendant's pretrial release would pose a danger to the community. Id. at 749-51, 107 S.Ct. at 2103.

Petitioner and Respondent cite district court cases that have evaluated INA § 236(c) under Salerno with differing results. Petitioner relies on Martinez v. Greene, 28 F.Supp.2d 1275 (D.Colo.1998), where the court held that INA § 236(c) had a regulatory purpose but was unconstitutionally "excessive" because it removed the Attorney General's discretion to make individual determinations. Id. at 1282. Respondent, on the other hand, cites Diaz-Zaldernia v. Fasano, 43 F.Supp.2d 1114 (S.D.Cal.1999), where the court held that INA § 236(c) passed constitutional muster because mandatory detention pending removal was a regulatory, reasonable, and nonexcessive means to carry out congressional immigration policy. [FN11]

FN11. See also Galvez v. Lewis, 56 F.Supp.2d 637, 1999 WL 547926 (E.D. Va. Jul 7, 1999) (following Diaz-Zaldernia and upholding INA § 236(c)); Van Eeton v. Beebe, 49 F.Supp.2d 1186 (D.Or.1999) (following Martinez and holding INA § 236(c) unconstitutional).

*8 If the court accepted Petitioner's argument that Salerno provided the proper analytical framework, could it conceivably agree with the Martinez court and hold INA § 236(c) unconstitutional. In Foucha v. Louisiana, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992), the Supreme Court struck down a Louisiana state law that required criminal defendants

acquitted by reason of insanity to be automatically committed to state psychiatric institutions, regardless of whether they were insane at the time of acquittal. Relying on Salerno, the Court found the statute constitutionally defective because it placed no durational limitation on confinement and did not require the state to show that the person was insane or dangerous. Id. at 82-83, 112 S.Ct. at 1786-87.

Assuming the Salerno reasoning applied to this case, INA § 236(c) fares even worse than the Louisiana statute struck down in Foucha. The statute mandates, automatically and without exception, the detention of any alien convicted of an aggravated felony or a serious controlled substance violation. It does not allow an alien to prove that she is neither a flight risk nor a danger to the community. It summarily denies bail for several broadly defined classes of aliens and precludes the Attorney General from consideration of individual circumstances. INA § 236(c) is, therefore, clearly excessive under Salerno and unconstitutional under Foucha.

However, the court respectfully disagrees with the assumption made by Martinez and Diaz-Zaldernia: that Salerno provides the appropriate analytical framework for evaluating the constitutionality of INA § 236(c). As Salerno recognized, detaining a presumptively innocent criminal defendant before a judicial finding of guilt deprives the person of a fundamental due process right to liberty, triggering the highest judicial scrutiny. "In our society liberty is the norm," the Court declared, "and detention prior to trial or without trial is the carefully limited exception." Salerno, 481 U.S. at 755, 107 S.Ct. at 2105. The Court's reasoning in Salerno therefore presumes the existence of a fundamental substantive Due Process liberty interest. If the party challenging detention has no such due process interest, the Salerno framework should not apply.

The analysis in Martinez and Diaz-Zaldernia suffers from failing to perform the most crucial step in the substantive due process calculus-precisely defining the right infringed by government action. Flores, 507 U.S. at 302, 113 S.Ct. at 1449. An alien who will almost certainly face removal does not stand on the same footing as a criminal defendant who has not yet been found guilty of a crime. See Parra, 172 F.3d at 958. Unlike the defendant in Salerno, Petitioner has already been convicted for an aggravated felony, an offense that virtually guarantees her removal from

Not Reported in F.Supp.2d
(Cite as: 1999 WL 803898, *8 (S.D.Cal.))

the United States. The court therefore holds that the analysis in Salerno does not apply where, as here, the alien lacks a cognizable fundamental Due Process interest under the Fifth Amendment.

V. Conclusion and Order

*9 For the foregoing reasons, the court DENIES the petition for a writ of habeas corpus. The Clerk of Court shall close the district court case file.

IT IS SO ORDERED.

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

**Attachment B**

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

December 6, 1999
#B-13

No. 99-3674

Michael Edwards, Appellant
v.
J. Scott Blackman, INS Director; ACLU
(M.D. of PA Civil No. 99-587)

Present:    SLOVITER, MANSMANN and GREENBERG, Circuit Judges

1.  Motion by Appellant to Dismiss Appeal and Vacate District
    Court Judgements dated May 27, 1999 and July 22, 1999;

2.  Reponse by Appellees.

Nicole M. Bruno
Case Manager (215)597-3131

Response is due 12/16/99.

ORDER

The foregoing *motion to dismiss appeal and vacate court judgments is granted as moot. The court exercises its discretion in vacating the court's judgments.*

By the Court,

Carol Los Mansmann
Circuit Judge

Dated: JAN 11 2000

Attachment C

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

FILED
SCRANTON

MAY 1 6 2000

PER _____ /cu
DEPUTY CLERK

KINGSLEY CHUKWUEZI,

       Petitioner

       vs.

JANET RENO, et al.,

       Respondents

:
:
:
:
:
: CIVIL ACTION NO. 3:CV-99-2020
: (CHIEF JUDGE VANASKIE)
:
:
:
:

RECEIVED
SCr _ _ .

_ ( 1 , 2000

MARY E. U _ _ _
PER _____
DEPUTY CLERK

### MEMORANDUM

       Pending in the above-captioned matter are the objections of respondent Attorney General Janet Reno to Magistrate Judge Thomas M. Blewitt's Report and Recommendation, which proposes that the challenge of petitioner Kingsley Chukwuezi to the mandatory detention provisions of 8 U.S.C. § 1226(c) be sustained. Specifically, Magistrate Judge Blewitt found persuasive those district court decisions which found unconstitutional section 1226(c)'s mandatory detention of an alien pending the outcome of removal proceedings that had been instituted on the ground that the alien had been convicted of an "aggravated felony."

       Chukwuezi, a native and citizen of Nigeria, was lawfully admitted to the United States in 1990, and became a lawful permanent resident alien in May of 1997. Chukwuezi alleges that he has been married to a United States citizen since December of 1992. The factual premise for the decision to commence removal proceedings against Chukwuezi is his January 28, 1998 conviction in the United States District Court for the District of Maryland of the offense of fraud and misuse of an alien registration card in

violation of 18 U.S.C. § 1546(a).

On or about May 17, 1999, Chukwuezi completed his 15-month sentence for this conviction. Upon his discharge from confinement by the federal Bureau of Prisons, Chukwuezi was taken into custody by the Immigration and Naturalization Service (INS) under the authority of section 236(c)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1226(c)(1).[1] The INS asserts that Chukwuezi is deportable pursuant to section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii), on the ground that his conviction constitutes an aggravated felony as defined in Section 101(a)(43)(P) of the Act, 8 U.S.C. § 1101(a)(43)(P).[2] On September 2, 1999, Chukwuezi was ordered deported to Nigeria based upon his conviction. He was also denied release pending the completion of removal proceedings due to the mandatory detention provisions of 8 U.S.C. § 1226(c).

Contending that his offense should not be regarded as a deportable aggravated felony, Chukwuezi has appealed the order of removal to the Board of Immigration

---

[1]Section 1226(c) states that "[t]he Attorney General shall take into custody any alien who . . . is deportable by reason of having committed . . . any [aggravated felony as defined in 8 U.S.C. § 1101(a)(43)] . . . when the alien is released [from confinement pursuant to a conviction]." Section 1226(c)(1) thus contemplates that, upon discharge of a sentence of imprisonment, an alien will be taken into INS custody and remain detained until completion of removal proceedings. Only if the release of such an alien is necessary to provide protection to a witness or person cooperating with a criminal investigation and the Attorney General is satisfied that such an alien will not pose a danger to other persons or property and will not flee may the alien be released while removal proceedings are pending. See 8 U.S.C. § 1226(c)(2).

[2]Section 101(a)(43)(P) defines the term aggravated felony as including "an offense of . . . (I) . . . falsely making, forging, counterfeiting, mutilating or altering a passport or instrument in violation of Section 1543 of Title 18, or is described in Section 1546(a) of such title (relating to document fraud) and (ii) for which the term of imprisonment is at least 12 months . . . ." 8 U.S.C. § 1101(a)(43)(P).

2

Appeals.  On November 17, 1999, he filed in this Court a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, challenging the mandatory detention provisions of § 1226(c) as unconstitutional on its face and as applied to him.[3]

As Magistrate Judge Blewitt observed, the judicial decisions on the validity of the mandatory detention provisions of 8 U.S.C. § 1226(c) are in conflict.  In Parra v. Perryman, 172 F.3d 954 (7th Cir. 1999), Galvez v. Lewis, 56 F.Supp. 2d 637 (E.D. Va. 1999), and Diaz-Zaldierna v. Fasano, 43 F.Supp. 2d 1114 (S.D. Cal. 1999), attacks on the constitutionality of the mandatory detention provisions of § 1226(c) were rejected.  By way of contrast, in Bouayad v. Holmes, 74 F.Supp. 2d 471 (E.D. Pa. 1999); Danh v. Demore, 59 F.Supp. 2d 994 (N.D. Cal. 1999), Van Eeton v. Beebe, 49 F.Supp. 2d 1186 (D. Ore. 1999), and Martinez v. Greene, 28 F.Supp. 2d 1275 (D. Colo. 1998), the mandatory detention provisions were found to be unconstitutional.

Having given plenary consideration to the matter, as required when a party files objections to a Magistrate Judge's Report and Recommendation, 28 U.S.C. § 28 U.S.C. §636(b)(1)(C); Sample v. Diecks, 885 F.2d 1099, 1106 n.3 (3rd Cir. 1989); Henderson v. Carlson, 812 F.2d 874, 878 ( 3rd Cir.), cert. denied, 484 U.S. 837 (1987); Owens v. Beard, 829 F. Supp. 736 (M.D. Pa. 1993), I find that the decisions rejecting constitutional challenges to § 1226(c) are limited to the factual scenarios presented in those cases and that those factual scenarios are materially distinguishable from that presented here.  For example, in Parra, the Seventh Circuit relied upon the fact that the petitioner conceded

---

[3]Chukwuezi's habeas petitions also challenged the Immigration Judge's determination that Chukwuezi's offense of conviction is an aggravated felony.  Because that matter is still before the Board of Immigration Appeals, consideration of that issue in this case is premature.

that he was a removable alien because of his conviction of aggravated sexual assault. Because of this concession, the petitioner effectively had the keys to his release as he could have simply consented to his removal to his native Mexico. Judge Easterbrook, writing for the unanimous appeals court panel, observed that "[a] criminal alien who insists on postponing the inevitable has no constitutional right to remain at large during the ensuing delay [to effect removal], and the United States has a powerful interest in maintaining the detention in order to ensure that removal actually occurs." 172 F.3d at 978. In Galvez, the petitioner was an illegal alien with a drug conviction. In finding that mandatory detention as applied in Galvez was not unconstitutional, the court explained that "[t]his case turns on Petitioner's unlawful alien status in this country." 56 F.Supp. 2d at 646. In Diaz-Zaldierna, the petitioner had been convicted of possession of crack cocaine, and the court concluded that the "controlled substances conviction is a sufficient ground to detain him without possibility of bail, at least for a reasonable time while his removal is adjudicated." 43 F. Supp. 2d at 1120.

In this case, unlike Parra, Chukwuezi does not concede that his conviction requires his removal from the United States. Unlike Galvez, Chukwuezi is not an illegal alien in this country; he has attained lawful permanent residence status. And unlike Diaz-Zaldierna, Chukwuezi does not stand convicted of a drug offense. Because the rationale of Parra, Galvez, and Diaz-Zaldierna were so linked to the factual settings of those cases, their holdings are unpersuasive here.

More persuasive are those decisions that have recognized that mandatory detention whenever the Attorney General charges an alien with an aggravated felony conviction sweeps too broadly. Those cases have recognized that INS detention is

4

indistinguishable from punitive incarceration.  Although INS detention is plainly regulatory and not intended as punishment, see Martinez, 28 F. Supp. 2d at 1282, the reality is that it is as restrictive as punitive confinement.  As Judge Weis remarked recently:

> Characterizing prolonged detention as anything other than punishment might be somewhat puzzling to petitioner, who remained in jail under the same conditions as before the state released him, although his status had technically changed from that of a state inmate to an INS "detainee." Similarly, an alien whose detention occurs in a maximum security federal prison may be forgiven for wondering when his punishment stopped and detention began.  As Justice Jackson remarked, "[i]t overworks legal fiction to say that one is free in law when by the commonest of common sense he is bound."  Mezei, 345 U.S. at 220 (Jackson, J., dissenting).  It is similarly unrealistic to believe that these INS detainees are not actually being "punished" in some sense for their past conduct.

Ngo v. INS, 192 F.3d 390, 397-98 (3d Cir. 1999).  Finding a fundamental liberty interest implicated in the detention of aliens awaiting a final removal decision, the courts that have found § 1226(c) unconstitutional have applied the compelling interest test of United States v. Salerno, 481 U.S. 739 (1987).  See, e.g., Danh, 59 F. Supp. 2d at 1000-01; Van Eeton, 49 F. Supp. 2d at 1189-90; Martinez, 28 F. Supp. 2d at 1281.  Concluding that mandatory detention of all criminal aliens is "excessive" in relation to the purposes sought to be advanced by § 1226(c) -- prevention of flight, protection of the community, and assure enforcement of the immigration laws -- those courts have directed that the INS afford some process by which a criminal alien can secure release pending the outcome of removal proceedings.

As note above, I find the rationale of cases such as Danh, Van Eeton and Martinez to be compelling.  Clearly in a case such as this one, involving a lawful permanent resident, incarceration implicates a liberty interest.  Equally clearly, a statute that presumes that all criminal aliens will abscond or pose a threat to safety sweeps too

broadly.

In some cases, § 1226(c) would ensnare a person who has resided in the United States for decades and has an arguable claim to citizenship. See e.g., Van Eeton, supra. As to such a person, he or she would be detained notwithstanding the existence of a bona fide challenge to the removal proceedings and the absence of any evidence of a flight risk or threat to safety. Unlike the situation confronting the court in Parra, a person subject to the removal process who claims citizenship cannot be regarded as having the keys to liberty. On the contrary, compelled confinement may provide the motivation to forego pursuit of an arguably valid defense to removal.

Also swept up in § 1226(c) is a lawful permanent resident alien's challenge to a determination by the INS that the offense of conviction constitutes an "aggravated felony." Section 101(a)(43) of the Immigration and Naturalization Act is a lengthy and complex provision. There will be cases where it is unclear that a criminal offense constitutes an "aggravated felony." In such cases, a lawful permanent resident of long standing will be forced to remain in custody while pursuing a challenge to the INS determination that he or she is subject to removal notwithstanding the absence of any evidence of a risk of flight or danger to the community.

The fact that an Immigration Judge will make an initial decision as to whether an offense of conviction constitutes an aggravated felony does not ameliorate the problem. Even where an Immigration Judge makes a determination that the detainee is not subject to removal, the INS may continue to detain the alien by filing its own notice of intent to

6

appeal. See 8 C.F.R. § 3.19(I)(2) (1999).[4] Thus, even a prompt determination by an

Immigration Judge that an alien's conviction does not constitute an aggravated felony so

that he or she  is not subject to removal does not alter the alien's detention status under §

1226(c).

Our Court of Appeals' decision in Ngo v. INS, 192 F.3d 390 (3d Cir. 1999), lends

additional support to a determination that the mandatory detention provisions of § 1226(c)

do not pass constitutional muster.  In Ngo, the court held that long term detention of an

alien subject to a final removal order did not violate due process provided there was a

possibility of the alien's eventual removal, there were adequate and reasonable

procedures to seek release pending removal, and there was an adequate factual premise

for a conclusion that detention was necessary to prevent a risk of flight or threat to the

community.  Id. at 397.  If an alien who is subject to a final removal order is entitled to an

opportunity to seek release pending execution of the removal order, then an alien who is

not yet subject to a final removal order should be accorded the same opportunity.  As

explained by Judge Katz in Bouayad:

> As the Third Circuit recognized in Chi Thon Ngo, due process
> demands an underlying justification for the detention of aliens.
> The petitioner in Chi Thon Ngo was an alien whose order of
> removal was final but who was still detained in the United
> States because his native country, Vietnam, refused to accept

---

[4] Section 3.19(I)(2), in pertinent part, provides:

If an alien is subject to [8 U.S.C. § 1226(c)(1)], . . . any order of the
immigration judge authorizing release (on bond or otherwise) shall be stayed
upon the Service's filing of a Notice of Service Intent to Appeal Custody
Redetermination (Form EOIR-43) with the Immigration Court on the day the
order is issued, and shall remain in abeyance pending decision of the appeal
by the Board of Immigration Appeals. [Emphasis added.]

7

him. The court emphasized the need for an individualized
evaluation of the petitioner's detention: "The process due even
to deportable and excludable aliens requires an opportunity for
an evaluation of the individual's current threat to the
community and his risk of flight."

          *          *          *

The interest affected by the mandatory detention provisions is
not whether an alien may remain in this country, but whether
the alien must be automatically detained while removal
proceedings are pending. The Third Circuit's holding in <u>Chi
Thon Ngo</u> clarifies that the issue of removability is
distinguishable from the issue of detention. In <u>Chi Thon Ngo</u>,
the petitioner was under a final order of removal; there was no
question that he would have to leave this country when and if
Vietnam agreed to accept him. However, the court found that
due process still necessitated meaningful periodic reviews of
the reasons for the petitioner's continued detention -- namely
whether he presented a risk of flight or a danger to the
community.

Admittedly, the petitioner in <u>Chi Thon Ngo</u> was unable to return
to Vietnam and so could not simply end his detention by
leaving this country . . . . However, where, as here, a petitioner
contests whether he is removable under 8 U.S.C. § 1227, the
option of ending detention by departing this country does not
cure any constitutionality infirmity in the mandatory detention
provisions. To hold otherwise would be to put the cart before
the horse by requiring an alien who is subject to mandatory
detention and not yet under a final order of removal to forego
any challenges to the removal proceeding in order to secure
his or her liberty.

74 F.Supp. 2d at 475, 476.

In this case, Chukwuezi is pursuing a challenge to the fact of removability. He has

been detained for approximately one year as a consequence of his challenge to

removability. While it may be that he should not be released while he pursues his

challenges, either because of factors such as the nature of his conviction or evidence that

he poses a flight risk or danger to some person or the community, he should be afforded

8

an opportunity to seek his release.  Because § 1226(c) denies Chukwuezi such an

opportunity, it is unconstitutional.  Accordingly, Chukwuezi is entitled to be released unless

the INS affords him a meaningful opportunity to be heard on the question of his release

pending the outcome of the removal proceedings.[5]  An appropriate Order is attached.[6]


Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

May 16, 2000

---

[5]Respondent is reminded of the admonition in <u>Ngo</u>, 192 F.3d at 398, and <u>Bouayad</u>, 74 F.Supp. 2d at 477, that "grudging and perfunctory review is not enough to satisfy the due process right to liberty, even for aliens."

[6]In light of this decision, there is no need to rule on Chukwuezi's pending motions for a temporary restraining order and for appointment of counsel.

9

FILED
SCRANTON

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA   MAY 16 2000

KINGSLEY CHUKWUEZI,                    :              PER _____

       Petitioner              :                        DEPUTY CLERK

       vs.                     : CIVIL ACTION NO. 3:CV-99-2020
                                       : (CHIEF JUDGE VANASKIE)
JANET RENO, et al.,                    :

       Respondents             :

<u>ORDER</u>

NOW, this 16th day of May, 2000, for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT**:

    1. The Report and recommendation of Magistrate Judge Blewitt (Dkt. Entry 11) is

**ADOPTED**.

    2. The petition for a writ of habeas corpus is **GRANTED** and the petitioner shall be

released unless within **thirty (30) days** the respondent accords petitioner the review

process that was found acceptable in <u>Ngo</u>, <u>supra</u>, or applies to petitioner other procedures

that are at least as favorable to the petitioner.

    3. The Clerk of Court is directed to mark this matter **CLOSED**.

Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania

O:\VANASKIE\DAVIES\ORDERS\CIVIL\99-2020

Attachment D

Citation                    Found Document      Rank 1 of 1        Database
Interim Decision (BIA) 3398                                        FIM-BIA
1999 WL 339053 (BIA)
**(Publication page references are not available for this document.)**

United States Department of Justice
Board of Immigration Appeals

IN RE Samuel JOSEPH, Respondent
File A90 562 326 - York
Decided May 28, 1999

(1) For purposes of determining the custody conditions of a lawful permanent resident under section 236 of the Immigration and Nationality Act, 8 U.S.C. § 1226 (Supp. II 1996), and 8 C.F.R. § 3.19(h)(2)(ii) (1999), a lawful permanent resident will not be considered "properly included" in a mandatory detention category when an Immigration Judge or the Board of Immigration Appeals finds, on the basis of the bond record as a whole, that it is substantially unlikely that the Immigration and Naturalization Service will prevail on a charge of removability specified in section 236(c)(1) of the Act.

(2) Although a conviction document may provide the Service with sufficient reason to believe that an alien is removable under one of the mandatory detention grounds for purposes of charging the alien and making an initial custody determination, neither the Immigration Judge nor the Board is bound by the Service's decisions in that regard when determining whether an alien is properly included within one of the regulatory provisions that would deprive the Immigration Judge and the Board of jurisdiction to redetermine the custody conditions imposed on the alien by the Service. Matter of Joseph, Interim Decision 3387 (BIA 1999), clarified.

(3) When an Immigration Judge's removal decision precedes the determination, pursuant to 8 C.F.R. § 3.19(h)(2)(ii), whether an alien is "properly included" in a mandatory detention category, the removal decision may properly form the basis for that determination.

(4) An automatic stay of an Immigration Judge's release order that has been invoked by the Service pursuant to 8 C.F.R. § 3.19(i)(2) is extinguished by the Board's decision in the Service's bond appeal from that release order.

Sandra L. Greene, Esquire, Philadelphia, Pennsylvania, for respondent

for the Immigration and Naturalization Service
Jeffrey T. Bubier
Assistant District Counsel

Before: Board En Banc: DUNNE, Vice Chairman; HEILMAN, HOLMES, HURWITZ, FILPPU, COLE, MATHON, JONES, GRANT, SCIALABBA, and MOSCATO, Board Members. Concurring and Dissenting Opinion: SCHMIDT, Chairman; joined by VACCA, VILLAGELIU, ROSENBERG, and GUENDELSBERGER, Board Members.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Page 10

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

FILPPU, Board Member:

On May 19, 1999, the Board issued an order which dismissed the Immigration and Naturalization Service's appeal from the Immigration Judge's January 20 and 22, 1999, bond orders releasing the respondent on his own recognizance. Our order informed the parties that this decision explaining the reasons for the order would be forthcoming.

## I. THE ISSUES AND SUMMARY

Our jurisdiction in this timely Service appeal is pursuant to 8 C.F.R. § 3.1(b)(7) (1999). See also Matter of Joseph, Interim Decision 3387, at 13-14 (BIA 1999); 8 C.F.R. §§ 3.19(h)(2)(ii), 236.1(c)(11), (d)(3) (1999). Today, we explain the import of our ruling in Matter of Joseph, supra, in light of the Service's arguments in this bond appeal. We also address the question of when an Immigration Judge will have jurisdiction to set bond for a lawful permanent resident who has been charged by the Service with a ground of removability that would otherwise require the alien's mandatory detention pending an administratively final order of removal.

As explained below, the Immigration Judge may make a determination on whether a lawful permanent resident "is not properly included" in a mandatory detention category, in accordance with 8 C.F.R. § 3.19(h)(2)(ii), either before or after the conclusion of the underlying removal case. If this threshold bond decision is made after the Immigration Judge's resolution of the removal case, the Immigration Judge may rely on that underlying merits determination.

If the Immigration Judge addresses whether the permanent resident is properly included in a mandatory detention category prior to completion of the case in chief, the Immigration Judge must have very substantial grounds to override the Service's decision to charge the alien with a ground that subjects the alien to detention. Thus, in this context, a lawful permanent resident will not be considered properly included in a mandatory detention category only when an Immigration Judge is convinced that the Service is substantially unlikely to establish, at the merits hearing, the charge or charges that subject the alien to mandatory detention.

In either situation, the Immigration Judge's bond ruling as to whether the alien is "properly included" in a mandatory detention category is subject to the Service's invocation of the "automatic stay" discussed in our prior ruling in this case.

## II. FACTS AND PROCEDURAL HISTORY

The respondent, a native and citizen of Haiti, was admitted as a lawful permanent resident in 1989. The respondent was convicted of the offense of "obstructing and hindering," a crime under the common law of Maryland. The charge to which the respondent pleaded guilty asserts that he "did intentionally and knowingly obstruct and hinder a police officer . . . in the performance of the (police officer) victim's duties." The respondent received a 1-year sentence. A statement appended to the criminal charging document asserts that

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

~~Case 1:00-cv-00702-WWC-PT    Document 11    Filed 06/12/2000    Page 42 of 74~~

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

the respondent, after departing his residence in a vehicle, was chased by a police officer and was finally apprehended in Delaware after jumping from his moving vehicle. It is not clear why the respondent was being pursued.

It appears that the respondent was taken into Service custody and removal proceedings were commenced in November 1998, charging that he was subject to removal under section 237(a)(2)(A)(iii) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(2)(A)(iii) (Supp. II 1996), as an alien who has been convicted of an aggravated felony as defined in section 101(a)(43)(S) of the Act, 8 U.S.C. § 1101(a)(43)(S) (Supp. II 1996) (obstruction of justice). The Immigration Judge, however, terminated the underlying removal proceedings on January 20, 1999, after deciding that the respondent's conviction does not qualify as an aggravated felony.

That same day the Immigration Judge issued an oral order in bond proceedings releasing the respondent from custody. The Immigration Judge followed his January 20, 1999, oral order with a written release order, dated January 22, 1999. The Service timely appealed both the Immigration Judge's decision terminating the respondent's removal proceedings and the Immigration Judge's order releasing the respondent on his own recognizance. The Service obtained an automatic stay of the release order during the pendency of its bond appeal, in accordance with our earlier ruling in this case. Matter of Joseph, supra. At present, we only address the Service's appeal from the Immigration Judge's release order and thereby resolve the bond appeal.

### III. THE SERVICE'S POSITION

The Service maintains that the respondent's conviction is for an aggravated felony, that he is therefore ineligible for release, and that the Immigration Judge lacked jurisdiction to redetermine the custody conditions imposed by the Service. The Service further argues that the Immigration Judge's decision in the respondent's removal proceedings, finding that the respondent is not an aggravated felon, is an improper basis for making a bond determination. The Service points out that it has timely appealed the Immigration Judge's removal decision and that it could prevail in its merits appeal. It argues that releasing an alien charged as an aggravated felon would be inconsistent with congressional intent in such circumstances.

Nevertheless, the Service has only provided a brief overview of its arguments on the underlying merits of the removal case, and it declines to "burden these bond proceedings with a complete exposition of its position on the merits." According to the Service, the respondent remains ineligible for release because his conviction record provided the requisite "reason to believe" that he is removable as an aggravated felon, in accordance with our earlier ruling in this case. See Matter of Joseph, supra, at 10 (discussing the "reason to believe" language contained in the regulatory history of the current bond regulations).

### IV. THE GOVERNING LAW

The provisions governing the respondent's detention, pending an administratively final order in removal proceedings, are section 236 of the Act,

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

8 U.S.C. § 1226 (Supp. II 1996), and the regulations in 8 C.F.R. §§ 3.19 and
236.1. The statute prescribes mandatory detention for certain aliens, including
those who are deportable by reason of having committed aggravated felonies.
Section 236(c)(1)(B) of the Act. An exception, pertaining to cases involving
witness protection, does not apply here. Section 236(c)(2) of the Act.

The regulations generally do not confer jurisdiction on Immigration Judges
over custody or bond determinations respecting those aliens subject to mandatory
detention, such as aggravated felons. 8 C.F.R. § 3.19(h)(2)(i)(D). The
regulations, nevertheless, specifically allow an alien to seek a determination
from an Immigration Judge "that the alien is not properly included within"
certain of the regulatory provisions which would deprive the Immigration Judge
of bond jurisdiction, including the one at issue here. 8 C.F.R. §
3.19(h)(2)(ii). We must examine the import of this latter provision given the
present posture of this case. [FN1]

In a case such as this, the structure of the bond regulations means that the
Immigration Judge's jurisdiction over custody issues is dependent on the answer
to the very same question that underlies the charge of removability in the case
in chief. In other words, if the respondent is removable as an aggravated felon,
the Immigration Judge lacks any bond jurisdiction. Conversely, the Immigration
Judge would have authority to redetermine custody conditions if the respondent
is not removable as an aggravated felon.

## V. THE REMOVAL DECISION MAY BE A BASIS FOR THE BOND RULING

Given the regulatory scheme, we find no basis to the Service's contention that
the Immigration Judge should not be able to use his ruling on the underlying
merits of the removal proceedings as the basis for his finding of jurisdiction
over the respondent's bond claim. Nothing in the regulations prohibits such
action by the Immigration Judge, and the regulatory structure would actually
seem to encourage the approach taken by the Immigration Judge, because the
essential question is identical in both contexts.

The Immigration Judge could have made a threshold assessment in the bond
context of whether the respondent's conviction was properly classified by the
Service as an aggravated felony. However, the Immigration Judge elected first to
complete the removal hearing. The Immigration Judge found that the respondent
had not been convicted of an aggravated felony, the only charge of removability,
and terminated the removal proceedings in the respondent's favor. Relying on his
removal finding, the Immigration Judge then made a determination in bond
proceedings that the respondent was not subject to mandatory detention and
ordered his release. Nothing in this sequence of events violates the structure
or spirit of the regulations, given that the Service's appeal of the removal
order meant that there was no final order in place. See 8 C.F.R. § 236.1(d)
("Once a removal order becomes administratively final, determinations regarding
custody and bond are made by the district director").

## VI. MATTER OF JOSEPH EXPLAINED

We also reject the Service's contention that the same basis for its initial

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Page 13
Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

charge of removability, which we found sufficient for purposes of the automatic stay as well, is adequate in this case to provide the needed "reason to believe" that the respondent is an aggravated felon when we reach the substance of the bond appeal. In this respect, the Service's reading of our decision in Matter of Joseph, supra, is erroneous.

What was decided in Matter of Joseph, supra, was the question whether an alien remains "subject to" section 236(c)(1) for automatic stay purposes after the Immigration Judge has decided that he is not subject to mandatory detention. 8 C.F.R. § 3.19(i)(2). The Service quotes language from that decision stating that "the respondent's conviction record provided the Service with the requisite .reason to believe' that the respondent was removable as an aggravated felon, and the respondent thus became .subject to' section 236(c)(1) of the Act when charged with removability under section 237(a)(2)(A)(iii)." Id. at 10. The Service appears to argue that the "reason to believe" which led it to bring the aggravated felony charge against the respondent is sufficient to control for bond purposes until the final resolution of the underlying removal case. While the Service's position may often be correct as a practical matter in other cases, this is because the nature of many convictions quite clearly make aliens subject to mandatory detention. But that will not be true in all cases, and we do not find it to be true here.

To clarify what we said in Matter of Joseph, supra, the respondent's conviction record provided the Service with the requisite "reason to believe" that he had been convicted of an aggravated felony for purposes of charging and making the initial custody determination. However, the Service's decision in that regard is not unreviewable by the Immigration Judge or the Board in either the bond or the removal context. We found in Joseph that the automatic stay regulation was intended as a means for the Service to preserve the "status quo" of the district director's determination that the respondent must be detained, but only until we decide the Service's appeal from the Immigration Judge's release order. Matter of Joseph, supra, at 16.

The Service evidently misunderstands the discussion in our earlier decision of the regulatory history of the automatic stay provision, which provides that the Board retains full authority to accept or reject the Service's contentions in its bond appeal. See Procedures for the Detention and Release of Criminal Aliens by the Immigration and Naturalization Service and for Custody Redeterminations by the Executive Office for Immigration Review, 63 Fed. Reg. 27,441, 27,447 (1998); Matter of Joseph, supra, at 12. The Service's position fails to recognize either the Immigration Judge's or the Board's role in the detention review process, apparently viewing our authority as being confined to looking only to whether the Service had a basis for charging the respondent with removability under one of the grounds listed in section 236(c)(1) of the Act.

Our role in this appeal is, instead, to determine whether the Immigration Judge correctly found that the respondent was not properly included in the mandatory detention scheme. This requires consideration of the evidence and argument offered during the bond proceedings on this question and of the force of the Immigration Judge's reasoning. It is more than just a perfunctory review and ratification of the fact that the Service may have had a "reason to believe" the respondent was an aggravated felon at the time it began the proceedings.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

### VII. THE INTERPRETATION OF 8 C.F.R. § 3.19(h)(2)(ii)

Our construction of the regulation at issue here flows directly from what we said in Matter of Joseph. Any presumption that the respondent is an aggravated felon based on his conviction record and the charge brought by the Service is insufficient, by itself, to control the outcome of the bond appeal if the record as a whole shows otherwise. In this regard, we understand that the very purpose of the regulation, 8 C.F.R. § 3.19(h)(2)(ii), is to provide an alien, such as the respondent, with the opportunity to offer evidence and legal authority on the question whether the Service has properly included him within a category that is subject to mandatory detention.

Here, the Immigration Judge was convinced by the respondent's arguments that his Maryland common law "obstructing and hindering" charge is not an aggravated felony. The Immigration Judge compared the Maryland case law argued by the respondent to federal law and agreed with the respondent that the elements of the crime, and the types of conduct which it includes, are not analogous to "obstruction of justice" as contemplated by the aggravated felony definition at section 101(a)(43)(S) of the Act.

The Service argues, however, that it has appealed the merits decision terminating removal proceedings. And it contends the following in its appeal brief: "If the Service turns out to be right, absent the Board's sustaining of the instant bond appeal, the respondent, an aggravated felon subject to mandatory custody, will have been released from custody. That is not the disposition envisioned by Congress in enacting the mandatory custody provision of section 236(c)."

But this case involves a lawful permanent resident who has been charged with only one ground of removability. Under our laws, the respondent would be allowed to reside and work in the United States, but for the pendency of the aggravated felony charge brought by the Service. And, as noted above, the bond regulations specifically accord a level of protection for aliens charged with grounds that would require mandatory detention. Those regulations allow for an independent assessment by an Immigration Judge and the Board, in the preliminary bond context, of whether the alien is "properly included" in a category subject to mandatory detention.

The mere fact that the Service has appealed in the underlying removal case, and in theory could prevail, cannot be sufficient, by itself, to require the reversal of the Immigration Judge in this bond appeal. If it were, there would seem to be little or no point to the regulatory provision that allows the Immigration Judge, and the Board on appeal, to make a determination on whether the alien is "properly included" in a mandatory detention category.

A determination in favor of an alien on this issue does not lead to automatic release. It simply allows an Immigration Judge to consider the question of bond under the custody standards of section 236(a) of the Act. Yet, under the Service's approach, an alien such as the respondent would seem to have no recourse to that ordinary bond provision, even in cases where the Service is wrong in its charge and will lose on appeal. As we explained in connection with our discussion of Matter of Joseph above, the regulation must have meaning beyond simply allowing for a perfunctory review of the basis for the Service's

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

charge. Indeed, the regulatory history indicates that this rule was intended to provide "for an individualized hearing on whether an alien in custody actually falls within a category of aliens subject to mandatory detention." 63 Fed. Reg. at 27,444 (emphasis added).

This, however, is a case of first impression, and the regulations do not spell out the precise role of an Immigration Judge or the Board in assessing, in the bond context, whether an alien is "properly included" in a mandatory detention category. Yet, this case also involves a lawful permanent resident. And, as we explain below, we find that the Service is substantially unlikely to establish the charge of deportability in its appeal of the underlying removal case. Under such circumstances, we find it inappropriate to continue to treat the respondent as an alien who is subject to mandatory detention, if we are to give meaningful life to the regulations allowing for an examination by Immigration Judges and the Board of this question. Thus, subject to the automatic stay provision, we determine that a lawful permanent resident will not be considered "properly included" in a mandatory detention category when an Immigration Judge or the Board is convinced that the Service is substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention.

The Immigration Judge here issued his bond ruling after the conclusion of the removal case. As indicated above, the Immigration Judge was entitled to rely on that merits decision in making the related bond determination that the respondent was not properly included in a mandatory detention category.

The regulations, however, allow this determination to be made by the Immigration Judge at a very early stage of the overall proceedings. The Service is, of course, entitled to bring any charge it deems warranted in a given case. Importantly, as the Service points out, the statutory scheme envisions the detention of aliens subject to grounds such as the aggravated felony charge here. Consequently, the Immigration Judge must have very substantial grounds to override the custodial effect of the Service's charge in those cases where the Immigration Judge addresses whether the permanent resident is properly included in a mandatory detention category prior to completion of the merits hearing.

It follows from what we said in Matter of Joseph, supra, at 10, that the "reason to believe" that the alien "falls within a category barred from release," which led the Service to bring a particular charge, can often be expected to suffice until the Immigration Judge resolves the merits of the removal case, a resolution that frequently occurs speedily in cases involving detained criminal aliens. 63 Fed. Reg. at 27,444-45. But the Immigration Judge is able to examine the basis for that charge and make an independent determination whether the alien "actually falls within a category of aliens subject to mandatory detention." Id. at 27,444. In requiring that the Immigration Judge be convinced that the Service is substantially unlikely to prevail on its charge, when making this determination before the resolution of the underlying case, we provide both significant weight to the Service's "reason to believe" that led to the charge and genuine life to the regulation that allows for an Immigration Judge's reexamination of this issue.

In addition, we note that the bond regulations generally allow for great flexibility in making rulings on custody issues. For example, 8 C.F.R. § 3.19(d)

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT   Document 11   Filed 06/12/2000   Page 47 of 74

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

provides in part: "The determination of the Immigration Judge as to custody
status or bond may be based upon any information that is available to the
Immigration Judge or that is presented to him or her by the alien or the
Service."

   Further, in assessing whether an alien is "properly included" in a mandatory
detention category during a bond hearing taking place early in the removal
process, the Immigration Judge must necessarily look forward to what is likely
to be shown during the hearing on the underlying removal case. Thus, for
example, the failure of the Service to possess a certified copy of a conviction
record shortly after taking an alien into custody would not necessarily be
indicative of its ability to produce such a record at the merits hearing. And
the same could be true of evidence tendered by the alien during an early bond
hearing.

### VIII. THE SERVICE'S PROSPECT FOR SUCCESS IN THE REMOVAL CASE

   Turning to the bond record in this case, we do have evidence respecting the
respondent's conviction for "obstructing and hindering" under Maryland law. We
agree with the Immigration Judge that this evidence strongly indicates that the
respondent's conviction resulted from his actions to obstruct or hinder his own
arrest.

   The Maryland case law relied upon by the Immigration Judge, Cover v. State,
466 A.2d 1276 (Md. 1983), reflects that the crime of obstructing and hindering
encompasses three types of offenses: (1) positive direct obstruction (i.e.
resisting one's own arrest), (2) passive direct obstruction (where a subject
refuses or fails to act as directed by a police officer), and (3) positive
indirect obstruction (where the police are not acting directly against the
subject, but are acting indirectly against another who has committed, or may
commit, a criminal offense, and the subject does an act which obstructs them in
their general duty to prevent or detect crime, intending to frustrate them in
the performance of that duty).

   At least in this bond case, the Service has provided little to challenge the
Immigration Judge's determination that the respondent's offense is not correctly
classified as an aggravated felony. The Service cites to Matter of Batista-
Hernandez, Interim Decision 3321 (BIA 1997), as support for its position.
However, we agree with the Immigration Judge that, unlike Batista- Hernandez,
the respondent in the present case was seeking to evade his own arrest, rather
than obstructing the arrest of another. The Service's reliance on United States
v. John, 935 F.2d 644 (4th Cir. 1991), is likewise unpersuasive. This sentence
enhancement case indicates that mere flight from an arresting officer is not
sufficient, in itself, to warrant an adjustment of a defendant's offense level
under the obstruction of justice provision in the United States Sentencing
Guidelines in U.S.S.G. § 3C1.1 (1990). See 18 U.S.C.A. ch. 3, § 3C.1.1 (West
1996). The Service has also not addressed the Immigration Judge's reliance on
the Supreme Court's decision in United States v. Aguilar, 515 U.S. 593, 599
(1995), for the proposition that an "intent to influence judicial or grand jury
proceedings" is more the sort of activity constituting an "obstruction of
justice" under the Act than is the respondent's conviction for obstructing or

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

hindering his own arrest in a manner that does not appear to have endangered the officer.

We do not purport to make a final ruling on whether the respondent's conviction falls within the aggravated felony provision of section 101(a)(43)(S). The possibility remains that the Service might offer some convincing argument in its merits appeal. However, it opted not to do so here. On the basis of this bond record, it appears that Maryland's "obstructing and hindering" law is divisible, encompassing the conduct of resisting one's own arrest. Even if some of the other categories of activities included in this crime might potentially be construed as obstruction of justice, we find that it is substantially unlikely that the offense of simply obstructing or hindering one's own arrest will be viewed as an obstruction of justice aggravated felony under section 101(a)(43)(S) of the Act for removal purposes. Consequently, we agree with the Immigration Judge that the respondent is not "properly included" in the category of aliens subject to mandatory detention for bond or custody purposes. 8 C.F.R. § 3.19(h)(2)(ii).

## IX. THE RELEASE ORDER

Our determination, in agreement with the Immigration Judge, that the respondent is not properly included in a mandatory detention category would not ordinarily end the bond inquiry. It simply means that the lawful permanent resident could be considered by the Immigration Judge for release under the general bond provisions of section 236(a) of the Act. In this case, however, the Service has not challenged the specific terms of the Immigration Judge's release order in its appeal brief.

Consequently, for the foregoing reasons, on May 19, 1999, we entered an order which extinguished the automatic stay that had attached upon the tendering of the Form EOIR-43 (Notice of INS Intent to Appeal Custody Redetermination) by the Service in this case. We now repeat that order for the sake of clarity.

ORDER: The appeal taken by the Service is dismissed.

FURTHER ORDER: The respondent shall be released pursuant to the terms of the Immigration Judge's January 22, 1999, bond order.

CONCURRING AND DISSENTING OPINION: Paul W. Schmidt, Chairman; in which Fred W. Vacca, Gustavo D. Villageliu, Lory D. Rosenberg, and John Guendelsberger, Board Members, joined

I respectfully concur in part and dissent in part.

I join entirely in the majority's rejection of the Immigration and Naturalization Service's appellate arguments and in the unanimous conclusion that, on this record, the Service is substantially unlikely to prevail on the merits of the aggravated felony charge. Therefore, I agree that the respondent is not properly included in the category of aliens subject to mandatory detention for bond or custody purposes.

However, I do not share the majority's view that the proper standard in a mandatory detention case involving a lawful permanent resident alien is that the Service is "substantially unlikely to prevail" on its charge. Matter of Joseph, Interim Decision 3398, at 10 (BIA 1999). Rather, the standard in a case such as the one before us should be whether the Service has demonstrated a likelihood of

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

success on the merits of its charge that the respondent is removable because of an aggravated felony.

Mandatory detention of a lawful permanent resident alien is a drastic step that implicates constitutionally-protected liberty interests. Where the lawful permanent resident respondent has made a colorable showing in custody proceedings that he or she is not subject to mandatory detention, the Service should be required to show a likelihood of success on the merits of its charge to continue mandatory detention. To enable the Immigration Judge to make the necessary independent determination in such a case, the Service should provide evidence of the applicable state or federal law under which the respondent was convicted and whatever proof of conviction that is available at the time of the Immigration Judge's inquiry.

The majority's enunciated standard of "substantially unlikely to prevail" is inappropriately deferential to the Service, the prosecutor in this matter. Requiring the Service to demonstrate a likelihood of success on the merits of its charge would not unduly burden the Service and would give more appropriate weight to the liberty interests of the lawful permanent resident alien. Such a standard also would provide more "genuine life to the regulation that allows for an Immigration Judge's reexamination of this issue," as referenced by the majority. Matter of Joseph, supra, at 10.

The Service's failure to establish a likelihood of success on the merits would not result in the release of a lawful permanent resident who poses a threat to society. Continued custody of such an alien would still be warranted under the discretionary criteria for detention.

In conclusion, mandatory detention should not be authorized where the Service has failed to demonstrate a likelihood of success on the merits of its charge. Consequently, while I am in complete agreement with the decision to release this lawful permanent resident alien, and I agree fully that the Service is substantially unlikely to prevail on the merits of this aggravated felony charge, I respectfully dissent from the majority's enunciation of "substantially unlikely to prevail" as the standard to be applied in all future cases involving mandatory detention of lawful permanent resident aliens.

FN1. 8 C.F.R. § 3.19(h)(2)(i) provides, in relevant part:
    Upon expiration of the Transition Period Custody Rules set forth in section 303(b)(3) of Div. C. of Pub. L. 104-208, an immigration judge may not redetermine conditions of custody imposed by the Service with respect to the following classes of aliens:
    (D) Aliens in removal proceedings subject to section 236(c)(1) of the Act (as in effect after expiration of the Transition Period Custody Rules) . . . .
    Aliens convicted of aggravated felonies fall within section 236(c)(1) of the Act, taking them outside the bond and custody jurisdiction of Immigration Judges. Nevertheless, 8 C.F.R. § 3.19(h)(2)(ii) provides in part:
    (W)ith respect to paragraphs (h)(2)(i)(C), (D), and (E) of this section, nothing in this paragraph shall be construed as prohibiting an alien from seeking a determination by an immigration judge that the alien is not properly included within any of those paragraphs.
Interim Decision (BIA) 3398, 1999 WL 339053 (BIA)

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Interim Decision (BIA) 3398
**(Publication page references are not available for this document.)**

END OF DOCUMENT

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

**Attachment E**

Citation                 Found Document          Rank 1 of 1          Database
S. REP. 104-48                                                        LH
S. Rep. No. 48, 104TH Cong., 1ST Sess. 1995, 1995 WL 170285 (Leg.Hist.)

CRIMINAL ALIENS IN THE UNITED STATES

SENATE REPORT NO. 104-48
April 7, 1995

Mr. Roth, from the Committee on Governmental Affairs, submitted the following

REPORT

PART I-INTRODUCTION

OVERVIEW AND SUMMARY OF THE INVESTIGATION

America's immigration system is in disarray and criminal aliens (non-U.S.
citizens residing in the U.S. who commit serious crimes for which they may be
deportable) constitute a particularly vexing part of the problem. Criminal
aliens occupy the intersection of two areas of great concern to the American
people: crime and the control of our borders.
Criminal aliens are a serious and growing threat to public safety that costs
our criminal justice systems hundreds of millions of dollars annually. Although
criminal aliens who commit serious crimes are subject to deportation under
current law, the deportation system is in such disarray that no one, including
the Commissioner of the Immigration and Naturalization Service, can even say
with certainty how many criminal aliens are currently subject to the
jurisdiction of our criminal justice system. We do know that the Federal Bureau
of Prisons confines about 22,000 criminal aliens-25 percent of the total Federal
prison population-and that both the number and percent have been growing
steadily since 1980. The Justice Department estimates that there are about
53,000 criminal aliens in federal and state prisons. However, this figure does
not include criminal aliens in local jails, on probation or on parole. The
Subcommittee conservatively estimates that there are 450,000 criminal aliens in
the United States who are currently incarcerated or under some form of criminal
justice supervision. [FN1]
Confinement of criminal aliens in state and federal prisons cost taxpayers
approximately $724,000,000 in 1990. This cost estimate is quite conservative
because it does not include the substantial costs associated with law
enforcement investigations, prosecutions, judicial proceedings, probation,
parole and deportation proceedings.
The Immigration and Naturalization Service (INS), the agency responsible for
detaining and deporting criminal aliens, is overwhelmed by the criminal alien
problem. While INS has responsibility for deporting all criminal aliens, the
agency is unable to even identify most of the criminal aliens eligible for
deportation. Even when INS identifies criminal aliens in a timely fashion,
current U.S. immigration laws-formulated in piecemeal style over the years by
Congress-permit those who object to delay their deportations for years by taking
advantage of an often-times irrational, lengthy and complex system of hearings

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

and appeals.

To make matters even more difficult for immigration officials, some local communities have adopted official policies of non-cooperation with the INS. Public employees in these communities are prohibited from providing information to the INS or cooperating with INS in most circumstances. Even in communities without such non-cooperation policies, criminal aliens who come in contact with state and local law enforcement officials are often not identified as aliens because it is difficult for untrained personnel to accurately determine citizenship. Consulting INS is often fruitless since the INS file system, which is name based, cannot reliably be used to identify criminal aliens because of the widespread use of aliases by such aliens. Even when state or local law enforcement officials correctly identify a criminal alien and notify the INS, INS often refuses to take action because of insufficient agents to transport prisoners, or because of limited detention space.

Even when a criminal alien is properly identified and the deportation process has begun, the procedures that the INS is required to follow are lengthy and complex. Criminal aliens may remain in the U.S. for years while they appeal their cases. After their appeals have been exhausted, some criminal aliens delay deportation for additional years by filing dubious asylum claims. Many criminal aliens are released on bond while the deportation process is pending. Ironically, INS routinely provides work permits, legally allowing such criminal aliens to work while their appeals are pending.

Delays can earn criminal aliens more than work permits and wages-if they delay long enough they may even obtain U.S. citizenship. Time spent in the U.S., whether it is in a prison, a jail, on bond or under community supervision, may count toward the 7 year residency requirement established by one section of the immigration laws.

Despite previous efforts in Congress to require detention of criminal aliens while deportation hearings are pending, many who should be detained are released on bond. Over 20 percent of nondetained criminal aliens fail to appear for deportation proceedings. Through 1992, nearly 11,000 criminal aliens convicted of aggravated felonies (which are particularly serious crimes) failed to appear for deportation hearings. Undetained criminal aliens with deportation orders often abscond upon receiving a final notification from the INS that requires them to voluntarily report for removal. (This notice is humorously referred by some INS personnel as the 72 hours "run notice.") Too often, as one frustrated INS official told the Subcommittee staff, only the stupid and honest get deported.

One would think that processing incarcerated criminal aliens for deportation would be a simple matter, but problems also exist here. INS directs much of its resources into the Institution Hearing Program (IHP) which entails identifying, processing and expeditiously deporting criminal aliens located within prison populations. But, instead of removing (from the U.S.) the "worst of the worst" as the INS asserts, the program is actually a fast-track home for the "best of the worst" criminal aliens. Cases that may be difficult to complete before sentences expire are excluded from the program in favor of less complicated, uncontested cases.

Focusing on these so-called "quick deports" yields impressive statistics but does little to resolve the underlying problems. For example, according to a

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

recent GAO study, immigration judges complete 79% of cases in the IHP before prisoners' sentences expire, but only 6% of all criminal aliens have their cases completed before their sentences expire. [FN2]  Thus, the great majority of criminal aliens, upon completing their sentences, are released from custody without being deported.

Even when the system does finally work and a deportation order is issued, delays may occur if the criminal alien's native country fails to issue travel documents in a timely fashion. While most countries are cooperative, some countries, including Nigeria, Jamaica, and the Dominican Republic were cited repeatedly as being uncooperative and employing delaying tactics in issuing necessary travel documents.

Finally, even after the lengthy deportation process has been completed and the criminal alien has actually been returned to his own country at U.S. taxpayer expense, deported criminal aliens often return to the U.S. in a matter of days or even hours. Deportation is too often perceived by criminal aliens as an inconvenience, perhaps even a blessing, providing an opportunity for a brief visit with friends and family before returning to the U.S. Although the crime of re-entry following deportation is a felony punishable by up to 20 years in prison (increased from 15 years by the 1994 crime bill), such cases are a low priority with federal law enforcement officials who often fail to prosecute unless the criminal alien has engaged in multiple reentries and has multiple felony convictions.

It is apparent from the foregoing summary that substantial legislative and administrative reforms are urgently needed if the problems presented by criminal aliens in the United States are to be adequately addressed.

First, the law governing deportation of criminal aliens should be dramatically simplified. After all, criminal aliens have already been afforded all the substantial due process required under our system of criminal justice before being convicted beyond a reasonable doubt of a felony. There is little reason for the multiple levels of appeal and delay in the deportation process which current law permits. Congress should   consider restricting defenses available to avoid deportation and allowing any appeals to be pursued only after deportation has taken place. Further simplification could be achieved if Congress were to eliminate the current distinctions among aggravated felonies, crimes of moral turpitude and drug offenses and simply make all felonies deportable offenses.

The Immigration and Naturalization Service must dramatically improve its recordkeeping procedures and adopt a finger-print based records systems. Fortunately, the INS Commissioner has announced plans to move toward adoption of such a system. [FN3]

Problems of undetained criminal aliens who fail to appear or who abscond after they are ordered deported would be lessened if the INS detained more criminal aliens. Congress should consider requiring the detention of all criminal aliens who are in the country illegally pending their deportation, and prohibit INS from releasing such criminal aliens on bond while providing them with work permits.

Current polices and practices have little deterrent effect on re-entry by deported aliens. Rather, they foster a kind of revolving-door that is, in the words of one Subcommittee member, "worthy of a feature on Saturday Night Live".

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT    Document 11    Filed 06/12/2000    Page 55 of 74

S. REP. 104-48

The Department of Justice should establish policies that make clear that all deported criminal aliens who illegally reenter the U.S. will be prosecuted and punished to the full extent of the law. Having increased the maximum penalty for re-entry after deportation, Congress should consider doing the same for failure to depart after being deported.

Countries that impede the removal of criminal aliens by failing to issue travel documents need to understand that if they don't take back their criminal citizens, the U.S. will invoke procedures to restrict travel visas for other citizens of that country. Such procedures are available under current law, but have never been invoked by the Justice Department or State Department.

Finally, as previously pointed out, some local jurisdictions have passed laws or adopted official policies prohibiting cooperation of their employees with the Immigration and Naturalization Service. Officials of some of these same local governments have often complained most loudly about the federal government's failure to stem the tide of illegal immigration across our borders. Congress should adopt legislation to discourage such local policies of non-cooperation. Senator Roth offered an amendment to the Senate crime bill, which was adopted 93-6, [FN4] that would cut crime bill funding to entities that adopt such official policies of non-cooperation.

## CRIMINAL ALIENS IN AMERICA

The Immigration and Naturalization Service reported that a record 873,000 new immigrants became legal permanent residents of the U.S. in 1993. As usual, the number of persons seeking legal entry from foreign nations, approximately 3.2 million according to the INS, far exceeded the number of visas issued.

The total resident alien population is estimated to lie between 12 and 15 million persons. [FN5] Aliens who are in the U.S. illegally, are known as "illegal aliens." INS reported that 1.2 million aliens were apprehended entering the U.S. illegally in 1992, [FN6] and INS estimates that in 1993 there were about 3.5 million illegal entries into America. [FN7]

This investigation concentrated on "criminal aliens" and how the U.S. Government responds to that problem. Criminal aliens are non-U.S. citizens residing in the U.S. who commit serious crimes for which they may be deportable. The person may or may not have entered the U.S. legally. While the term "criminal aliens" is not specifically defined statutorily, it applies mainly to aliens convicted of "aggrevated felonies" or crimes involving moral turpitude. Aggrevated felonies are defined in the Immigration Act of 1990, while definitions of moral turpitude depend on state law.

While there are no completely dependable figures for the number of criminal aliens in the United States, a combination of INS and GAO statistical data leads to a conservative estimate of 450,000 criminal aliens in the criminal justice system at any given time. The fact that many criminal aliens have entered the U.S. illegally helps explain why so many aliens are involved in crime their illegal situation conveys an "outlaw" status, often leading them into the shadowy realms of criminal lifestyles. The point was made succinctly in Congressional testimony by a former Commissioner of the INS, "Those entering the United States illegally have no legitimate sponsors and are prohibited from holding jobs. Thus, criminal conduct may be the only way to survive". [FN8]

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

While estimates of the exact number of criminal aliens in America are quite large, the number of criminal aliens deported each year is much smaller. The INS reported deporting about 19,000 criminal aliens in FY '93-approximately four percent of the estimated total of criminal aliens in the U.S. At that rate, assuming no additional aliens commit crimes here, it would take more than 23 years to deport all the criminal aliens in the United States.

## THE INVESTIGATION

The Subcommittee's investigation began in June, 1993 and culminated with hearings before the Subcommittee in November, 1993. All aspects of the Government's efforts related to criminal aliens were considered in the investigation, including: the identification of criminal aliens; notification of the INS that a confined person may be deportable; record keeping; detention of criminal aliens; case handling by prison officials; adjudication by the Executive Office of Immigration Review (EOIR), the adjudicating body that hears appeals from the INS regarding the administration and interpretation of immigration law; the appeals process; actual deportation; and fugitive apprehension.

In conducting the investigation, Subcommittee staff observed border operations at Chula Vista, California, and interviewed officials in California representing local jails, the state prison system and local offices of INS and the Executive Office of Immigration Review. Staff also met with INS officials in Philadelphia, Pennsylvania, and with Delaware state prison officials in Wilmington, Delaware. In Washington, DC, staff extensively interviewed officials from the INS, the EOIR and the Federal Bureau of Prisons. Several Institutional Hearing Program (IHP; explained below) locations were visited including sites at California's Donovan State Prison, the Los Angeles County Jail, and the Federal facilities at Oakdale, Louisiana.

The Subcommittee conducted two days of hearings under the direction of Senator William V. Roth, Jr., then the Ranking Minority Member, with the concurrence of Senator Sam Nunn, then the Subcommittee Chairman. At the November 10, 1993 hearing, the Subcommittee heard testimony from the minority staff regarding the findings of the investigation, as well as testimony by three criminal aliens who were serving sentences for a variety of crimes they had committed while in the U.S. On November 16, 1993, Immigration and Naturalization Service Commissioner Doris Meissner, along with other INS officials, responded to questions from Subcommittee Members. Also testifying on November 16 were Chief Immigration Judge Jere Armstrong of the Executive Office of Immigration Review, and Immigration Judge Thomas Fong from Los Angles, California. [FN9]

## THE CHALLENGE OF CRIMINAL ALIENS IN AMERICA

While there is a continuing debate in our Nation concerning what to do about crime and criminals, a consensus seems to exist regarding criminal aliens. That is, there is just no place in America for non-U.S. citizens who commit criminal acts here. America has enough criminals without importing more. That consensus, however, has not solved the problem. In fact, simply put, a significant portion of America's law enforcement resources are currently directed toward the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT   Document 11   Filed 06/12/2000   Page 57 of 74

S. REP. 104-48

apprehension, adjudication and confinement of criminal aliens.

## IMPACT ON LAW ENFORCEMENT

   Criminal aliens are a growing threat to the public safety and a growing drain on scarce criminal justice resources. Our federal and state prisons alone currently house over 53,000 aliens. As recently as 1980, this number was well below 9,000. Aliens now account for over 25 percent of federal prison inmates and represent the fastest growing segment of federal prison population. [FN10] A conservative estimate is that there are 450,000 aliens who have been convicted of a crime and who are in prison, in jail, on probation or on parole in the United States. [FN11]  Criminal aliens not only occupy beds in our prisons and jails, they also occupy the time and resources of law enforcement and our courts. Although immigrants to the United States have been, and continue to be, predominantly hard working and law abiding, there appears to be a growing criminal class among immigrants, especially among those here illegally.
   The increase in the number of aliens in the federal prisons is also noteworthy-the number more than doubled between 1988 and 1993. (See Table 1.) Currently, the Federal Bureau of Prisons (BOP) confines 89,078 prisoners and 22,626 are aliens, while in 1988 BOP confined 50,553 prisoners and 10,647 were aliens. [FN12]
TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
   The five states most heavily burdened by alien prisoners, according to a 1992 survey by the National Institute of Corrections, are: California (10,575, 10.4 percent of prison population); New York (7,168, 12.4 percent of prison population); Florida (3,313, 7 percent of prison population); Illinois (2,912, 1 percent of prison population) and Texas (2,187, 4.3 percent of prison population). [FN13]
   Approximately 47 percent of state and 36 percent of federal alien prisoners are from Mexico. States confine large numbers of aliens from the Caribbean (26 percent), and from Central and South America (14 percent). Crimes for which aliens are confined are primarily drug related (45 percent) or violent (34 percent). The federal prison system confines many people from Colombia (20 percent); Cuba (9 percent); and the Dominican Republic (6percent). The BOP confines an even higher percentage of aliens convicted of drug offenses, nearly 80 percent of the total number of confined aliens. [FN14]
   Considerable taxpayer dollars are being spent policing, adjudicating, confining, and deporting criminal aliens. In 1990, state, local and federal governments directed over $74 billion tax dollars for law enforcement activities. A full year of imprisonment (which of course is only a part of law enforcement costs), according to a recent Bureau of Justice Statistics report, costs approximately $15,600, per prisoner. [FN15]  The number of state and federal aliens in prison in 1990/91 (estimated to be 46,000 using figures from the Bureau of Prisons and the Bureau of Justice Statistics), can be multiplied by the annual per capita cost (estimated at $15,600) to produce a conservative cost estimate of approximately $724 million for confinement alone of criminal aliens. [FN16]
   These cost estimates are conservative because they do not account for the costs of criminal aliens in local jails and on probation and parole. How many

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT   Document 11   Filed 06/12/2000   Page 58 of 74

aliens are in jails on probation or parole? In some locales, the number cycling through local jails is very high. In Los Angeles, about 22,000 deportable aliens pass through the county jail annually judging from the results of several studies. [FN17]

The exact number of criminal aliens on probation and parole is unknown but it can be estimated since parole populations tend to be very similar to prison populations. While not all criminal aliens on probation or parole have committed deportable offenses, most probably have. There are more persons on probation (2,670,234) than under any other form of correctional supervision. According to the Justice Department's Bureau of Justice Statistics, more than half of all persons on probation in 17 states across 32 counties committed felony crimes. [FN18]  At the time sentences were delivered, 27 percent of those convicted of a violent felony (murder, rape, robbery, and aggravated assault) received a straight probation sentence, or a jail-probation sentence. We would therefore expect significant numbers of deportable persons to be under the supervision of probation authorities.

Also excluded from the $724 million estimate are the cost of INS resources used to investigate, detain and deport criminal aliens. Nor does this estimate include the heavy law enforcement costs of investigation and apprehension. Of course, criminal aliens also take up prison space which could be used for other prisoners. Some expensive additional prison construction could likely be avoided were it not for this displacement of bed space by criminal aliens. One former INS Commissioner has estimated the aggregate cost to U.S. taxpayers of criminal aliens to be in the billions. [FN19]

In 1992 the INS deported 18,375 criminal aliens. While this is a 30 percent increase from 1991 and more than double the number deported in 1990, [FN20] these figures mask the fact that criminal aliens stream back across the border in large numbers following deportation-especially along the southwest border. While reported arrests for re-entry are not very high, [FN21]  anecdotal evidence suggests that re-entry after deportation is widespread and that deportation is not a significant deterrent to re-entry. That may be in part because some U.S. Attorney's offices have policies that limit re-entry prosecutions to offenders who have multiple illegal reentries and multiple felony convictions. Other districts have informal caps on the number of re-entry cases they will prosecute. [FN22]  Even when re-entry cases are prosecuted, they are often plea bargained to a minimal sentence, even though the maximum potential sentence for re-entry after deportation is 15 years.

## LAWS GOVERNING CRIMINAL ALIENS

For much of this country's history there has been no comprehensive body of immigration law and no laws at all addressing criminal aliens. The Federal government first assumed an active role in immigration policy with the enactment of the first general immigration statute in 1882. The 1882 statute addressed criminal aliens by barring the entry of so-called undesirables, including convicts, mental defectives and paupers. The Act did not, however, provide for the deportation of aliens who committed crimes after entering the U.S.

In 1917 and 1924, restrictive immigration legislation was enacted. The 1917 Act included the first criminal ground for deportation, providing for the

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

deportation of aliens who committed "serious crimes" within five years after entry. The Act also provided for deportation of aliens without limitation on length of time after entry, who after entry proved to be "criminals of the confirmed type." [FN23]

The Immigration and Nationality Act (INA) of 1952 was a major recodification and revision of the immigration laws. The INA carried forward many of the elements enacted in 1917 and 1924. It expanded federal authority for deporting certain criminal aliens and specified "crimes of moral turpitude" [FN24] as crimes that could subject an alien to deportation. Criminal alien policy continues to operate under the framework established in 1952 by the INA.

Under the INA, the INS may apprehend and deport criminal aliens who have been: (1) convicted of a crime involving moral turpitude committed within five years of entry and sentenced to confinement for a year or more, or (2) convicted of two or more crimes involving moral turpitude, not arising from a single action, at any time after entry regardless of whether confined. [FN25] Aliens convicted of drug and firearm offenses are also deportable. Once deported, aliens are considered to be excludable, which means they cannot reenter the country for 5 years after deportation without the permission of the Attorney General. Re-entry after deportation is a felony.

The next major piece of immigration legislation that included provisions addressing criminal aliens was the Immigration and Control Act of 1986 (IRCA). [FN26] IRCA required that the INS begin deportation proceedings against aliens with deportable offenses as expeditiously as possible after their convictions. IRCA authorized general increases in all enforcement activities and contained provisions to improve interior (areas removed from the borders) enforcement against criminal aliens. IRCA also authorized the Attorney General to reimburse states for costs incurred imprisoning illegal aliens convicted of felonies. These authorizations, however, have not been funded.

The Narcotics Traffickers Deportation Act (Subtitle M of the Anti-Drug Abuse Act of 1986) significantly broadened the range of narcotics violations subjecting a criminal alien to exclusion or deportation. Prior to the 1986 Act, only those aliens convicted of violating a law or regulation regarding an "addiction-sustaining opiate" could be deported. The 1986 law did away with the addiction-sustaining opiate language and replaced it with the current broader language–"controlled substance." The Act also required that the INS respond promptly to referrals from federal, state and local law enforcement regarding alien arrests for violations of narcotics laws.

The Anti-Drug Abuse Act of 1988 made further changes to the INA with regard to criminal aliens. [FN27] The most significant of these changes was the creation of a new class of criminal alien-aliens convicted of an aggravated felony. Aliens who commit aggravated felonies are deportable, and are subject to different treatment under the law than other deportable criminal aliens. For example, aggravated felons are precluded from obtaining certain types of relief that non-aggravated felons may seek. Aggravated felonies include drug trafficking, firearm offenses, money laundering, certain crimes of violence and murder. [FN28] For the purposes of the aggravated felony definition, drug trafficking has been broadly defined as "any trade or dealing, and any drug trafficking crime." [FN29]

The 1988 Act required, among other things, that an alien convicted of an

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

aggravated felony: be taken into INS custody upon completion of his sentence; be ineligible for release under bond; and be ineligible for voluntary departure unless the alien is a permanent resident, is not a threat to the community, and is likely to appear for his hearing. The clear intention of this provision is to prevent the very worst of the criminal aliens from further endangering the public and from being able to flee before deportation. This provision, however, was weakened substantially by a later "technical amendment," which allowed not only aggravated felons who are permanent resident aliens to be released, but also all aggravated felons who entered the country legally even though they may have quickly become illegal. [FN30]

The 1988 Act also mandates a 24 hour alienage determination capability so that the INS could respond to law enforcement inquiries, and an INS computer system to maintain records of aliens convicted of aggravated felonies who have been deported. The Act further mandated that the INS institute special deportation proceedings within correctional institutions for aliens convicted of aggravated felonies to eliminate the need for detention and to ensure expeditious deportation.

The Immigration Act of 1990 [FN31]  (IMMACT 90) contained several provisions dealing with criminal aliens. A provision to aid the INS in deporting criminal aliens, known as section 507, required that states provide the INS notice of convictions of aliens and provide any requested certified record of conviction, without fee, within 30 days of a request by INS.

While the U.S. has had a basic legal framework for addressing the problem of criminal aliens since 1917, subsequent immigration law changes as evidenced in the 1965 Act, and most recently IRCA and IMMACT 90, have dealt with the problem of criminal aliens mostly as an afterthought. In fact, no major immigration legislation has focused exclusively on the problem of criminal aliens. Rather, legislation governing treatment of criminal aliens has been enacted in a piecemeal fashion.

It is clear that our immigration laws governing treatment of criminal aliens need reevalution-particularly those governing deportation and appeals. In several instances, the requirements of the law are not being met. In other instances current law is ill conceived.

### INS ALIEN CRIMINAL APPREHENSION PROGRAM

INS implemented its Alien Criminal Apprehension Program (ACAP) in 1986.  The goals of the program are: to identify, locate and initiate removal proceedings against  criminal aliens; to ensure expeditious removal of convicted alien criminals; and to create an effective deterrent against aliens seeking entry into the United States for the purpose of engaging in crime. [FN32]

Although the INS claims to carry out  its Alien Criminal Apprehension Program through practice and reactive measures, a large part of INS resources  appear to be devoted to a reactive strategy. This reactive strategy aims  to identify criminal aliens already involved in the criminal justice  system for reasons other than immigration violations, and to institute deportation proceedings against those criminal aliens. Under this strategy, if everything works properly, the criminal alien is identified while incarcerated in a local, state or federal correctional facility. INS determines whether the criminal alien is

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT   Document 11   Filed 06/12/2000   Page 61 of 74

potentially deportable and, if so, places what is known as a detainer on the on the alien (the detainer requests that the correctional system incarcerating the criminal alien notify INS before it releases the criminal alien so that INS can physically detain or conditionally release the criminal alien pending removal). INS then institutes a deportation proceeding against the criminal alien and finally, after the deportation hearing process has been completed, deports the criminal alien.

Within the Alien Criminal Apprehension Program, the INS has several "sub-programs." One such program is the so-called Five State Criminal Alien Model. This program focuses INS resources on states with the highest concentration of foreign-born inmates: California, New York, Texas, Florida and Illinois. The program seeks, through discussion and agreement among federal, state and local entities, to improve identification, processing and removal of criminal alien inmates.

Another program within the Alien Criminal Apprehension Program is the Institutional hearing Program (IHP). The IHP is a cooperative program between the Executive Office of Immigration Review the INS, seven federal prisons, 68 state prisons and Los Angeles County Correctional System. The IHP allows the INS and the Executive Office of Immigration Review to begin deportation proceedings for criminal aliens during their incarceration for their underlying criminal convictions. The IHP is designed to Immigration Reform and Control Act mandate that the INS begin deportation proceedings against aliens with deportable offenses as expeditiously as possible after their convictions, while also serving to reduce INS detention costs by deporting criminal aliens prior to their release from prison. As previously noted, however, the INS is required by current law to detain only a small percentage of criminal aliens after their release from federal, state or local incarceration. Although the 1988 Anti-Drug Abuse Act mandates that INS detain all aggravated felons after their release from prison pending their deportation, IMMACT 90 permits discretionary release on bond in deportation cases for aggravated felons who entered the U.S. legally. [FN33]

As part of the Alien Criminal Apprehension Program, the INS also uses several central facilities established to detain criminal aliens received into its custody. One such facility is the Federal Detention Center (FDC) in Oakdale, Louisiana. The INS moves some criminal aliens who have completed their sentences in state, local and federal facilities from locations throughout the country to Oakdale FDC for their immigration hearings. Also, INS's Service Processing Center in San Pedro, California is used as a centralized detention facility for West Coast Criminal aliens.

INS claims ACAP "is an extremely effective and efficient use of INS resources because these aliens have already been arrested and detained or incarcerated, thus minimizing the expense and effort which would otherwise be required for INS to locate and detain them." [FN34] However, based on the Subcommittee's investigation, the program appears to have little real impact in dealing with the large criminal alien population in most states.

FAILURE TO EFFECTIVELY COMBAT THE GROWING PROBLEM OF CRIMINAL ALIENS

The Subcommittee found serious and long-running problems with INS efforts to

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

deal with criminal aliens. These problems exist at the initial identification stage, the final deportation stage, and most points in-between. In addition, the Subcommittee found that the INS cannot accurately measure the extent of the criminal alien problem nor its response to that problem because its record keeping system is so limited.

## INS RECORD KEEPING SYSTEM

The INS record keeping system for criminal aliens is outdated and seriously flawed. The system's many failures allow criminal aliens to easily evade INS detection. These failures stem from the fact that the INS does not have a central record keeping system for specifically tracking criminal aliens. Moreover, the central record keeping system which INS does have is name-based and thus unable to readily identify those criminal aliens who employ multiple aliases.

INS assigns all immigrants, excluding tourists, an "A" number and creates a paper file for each individual which is known as an "A-file." Once an A-file is established, certain limited information from the file, including name and date of birth, is fed into the INS central index system. The central index system can be accessed by INS officials nationwide. To access the central index system, an INS official enters the name of someone whose record must be reviewed. If the system identifies more than one individual with that name, a date of birth can be entered to further narrow the search. Once a specific individual is identified through the central index system, the searcher can then access a limited amount of information, including the officer where the A- file is physically located. (An A-file is typically stored in the district office where it was opened.) The INS officer can then request the file.

A major weakness of the central index system is that it is name-based. Criminals, including criminal aliens, tend to use multiple names or aliases. One study, for example, found that the typical criminal alien used an average of seven aliases. [FN35]  If a criminal alien who is already in the central index system and has an A file is arrested under an alias, a query of the INS central index system will provide no match. If some INS action is required, the agent handling the case may not learn of the already existing file on the individual, and consequently will open a new A-file for this "newly encountered" alien. It is thus not uncommon for a criminal alien to have multiple A-files in the INS record system, with each file showing only part of the alien's criminal and immigration history.

The case of Jose Carmen Encarnacion illustrates the system's flaws. In 1976, Encarnacion entered the U.S. illegally from his country of citizenship, the Dominican Republic. Encarnacion was apprehended and then deported back to the Dominican Republic in 1977. At some point before 1980, Encarnacion re-entered the U.S. and proceeded to commit a series of serious crimes in the New York area. He was eventually arrested, convicted and incarcerated by New York authorities for several years. After being released from prison, he was not deported, detained by INS or prosecuted for re-entry, even though he has re-entered after deportation in violation of the law. Subsequently, Encarnacion was arrested in New York and Louisiana, but fled both states. In 1988, Encarnacion was apprehended in Puerto Rico where he admitted to immigration officials that

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

he had entered the U.S. illegally. Although Encarnacion was deported for the second time, INS officials were apparently not aware of his earlier deportation because he was using an alias. In any event, he was not prosecuted for re-entry after deportation. In fact, between 1977 and 1988, Encarnacion used a minimum of 10 different names and five different dates of birth. INS created an immigration file for Encarnacion in 1977 and a second separate file for him using a different name and date of birth in 1988.

Encarnacion returned to the U.S. after his second deportation in 1988 and proceeded to commit, and eventually be arrested for, a series of crimes. After 16 years of criminal activity in the United States, and 13 years after having been first deported, Encarnacion has now, for the first time, been prosecuted for re-entry after deportation. Although Encarnacion's fingerprints were taken many times, including several times by the INS, the INS did not, and does not, have the capability to search its files using fingerprints as identifiers. This prosecution occurred only because the INS discovered that Encarnacion had been deported several times after an agent's suspicion led to a manual search of fingerprint records to determine that Encarnacion had been previously deported under different names.

INS's difficulties with identification and subsequent tracking of criminal aliens are well documented [FN36] and were discussed at length during the Subcommittee's hearings. INS Commissioner Meissner explained that the INS has initiated several major systems automation initiatives for positive identification and information sharing using biometric data such as fingerprints. INS Assistant Commissioner Kleinknecht added that seven western states banded together and developed a quick turnaround fingerprint-based identification system which INS offices in that region routinely access. [FN37] However, other states have no such capability and the INS is relying on the FBI to develop and make available its national "AFIS" system. [FN38] At the time of the Subcommittee's hearings, INS officials were unable to determine exactly when a fingerprint-based system would be available to the INS nationwide. Subsequently, on June 2, 1994, INS officials announced a new program to develop an automated fingerprint based identification system. Assuming adequate funding, this system is projected to be in place within three years. However, the system will include future records only and there are no plans to convert the estimated 43 million "A" files to a fingerprint based system.

## INS IDENTIFICATION OF CRIMINAL ALIENS IN THE CRIMINAL JUSTICE SYSTEM

Currently, the INS falls far short of its stated objective to "systematically identify, locate and initiate removal proceedings against criminal aliens, whether or not incarcerated." [FN39] The Subcommittee's investigation found that the majority of criminal aliens identified by the INS are those who are incarcerated in state or federal prisons. However, since correctional officials are not trained to determine alien status, the INS usually relies on lists of foreign born inmates supplied by correctional officials to make an initial identification of potentially deportable criminal aliens. Under these circumstances, deportable criminal aliens can and do avoid detection and deportation by simply claiming to be U.S. born. One INS district director told staff that INS agents noticed that a particular state prison system had an

Case 1:00-cv-00702-WWC-PT    Document 11    Filed 06/12/2000    Page 64 of 74

S. REP. 104-48

unusually high number of inmates from the U.S. Virgin Islands and Puerto Rico. On closer inspection it was discovered that inmates from other Caribbean nations were routinely claiming to have been born in the U.S. Virgin Islands or Puerto Rico in an effort to avoid identification as criminal aliens.

Another more serious problem is that many state corrections systems and most county and local jails are not systematically monitored by the INS in an effort to identify criminal alien felons who are deportable. Moreover, no effort is made by INS to identify deportable alien felons who receive probation rather than sentences of incarceration. When one specific local court in California was carefully screened for aliens, about 36 percent of the total docket involved criminal aliens and more than half of all cases were probation violators. [FN40]

While INS officials understand that the current identification strategy focused entirely on prisons misses many criminal aliens, they defend the policy on grounds of lack of resources. As INS Assistant Commissioner Jack Shaw testified before the Subcommittee:

In New York City alone there are 14 courts. So while I would agree in concept that we have to see how we can bring our resources to bear more effectively, the fact is if we move away from the penitentiary system where the "worst of the worst" are incarcerated and try to move at this point into probationers and parolees or into putting investigators into monitoring court dockets, it is beyond our capability or capacity. [FN41]

There are 7,665 correctional facilities and offices in the United States and only about 1,100 INS investigators. Moreover, investigators do not work exclusively or even primarily on criminal alien matters. However, the wisdom of using highly trained investigators to do relatively routine monitoring of prisons is questionable. Commissioner Meissner acknowledged that using investigators in this capacity was inefficient and explained that the Office of Personnel Management and the Department of Justice had approved a para-professional position for "Investigative Agent" at the GS 5-9 level.

INS has only one program in the nation-at the Los Angeles County jail-designed to identify criminal aliens at the county jail level. A review of the INS Institutional Hearing Program at this facility revealed marked deficiencies; namely that deportable criminal aliens are being missed (i.e., not being identified as such) as too few cases are being presented to immigration judges.

The Los Angeles County jail system is one of the largest in the world, holding approximately 20,000 inmates at any given time. According to the Los Angeles County Sheriff's Office, the average inmate's stay is 30 days, with over 260,000 prisoners passing through the system each year. [FN42]  Thus, inmate population turnover is very high. A 1990 study estimated that 11 percent of the inmates in the Los Angeles County jail system are deportable criminal aliens. [FN43]  Based on these numbers, it can be estimated that more that 20,000 criminal aliens pass through the Los Angeles County Jail each year. However, in FY 1993, only 642 criminal aliens cases were reviewed by immigration judges in the IHP at this facility.

The Institutional Hearing Program at the Los Angeles County Jail is a cooperative effort of the INS, the Executive Office of Immigration Review, and the Los Angeles County Sheriff's office. The Sheriff's office provides the INS with a list of new foreign-born inmates each day. The INS reviews that list and interviews inmates periodically. Most of these interviews, however, are

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

conducted just prior to when the prisoners are due to be released from custody, leaving the INS little time to act. INS officials assert that detainers are placed only on the worst cases, as time permits.

Although the EOIR assigns an immigration judge to the Los Angeles County Jail one day each week, that judge often has few cases presented to him under the IHP. A review of EOIR records shows that as few as six criminal alien cases were presented to EOIR judges on a given day even though an immigration judge can adjudicate up to 30 cases in a half-day session. Los Angeles Immigration Judge Thomas Fong explained in his testimony that the cases presented to him are mainly cases that can be completed before prisoners are released. There are simply not that many criminal aliens who are likely to serve the 60-90 days required to complete a review.

It is clear that deportable criminal aliens are being missed by this program. In a 1992 report to the Congress, INS asserted that, "Cases filed for inclusion in the IHP must meet certain EOIR criteria for acceptance" and that cases are selected so as to "conserve limited EOIR judicial resources and ensure sufficient time for the case to be heard in a deportation hearing prior to release of the alien." [FN44]  However, EOIR contends that it is the responsibility of the INS to issue charging documents to initiate deportation proceedings. [FN45]  Clearly, the Justice Department needs to reconcile the conflicting views of INS and EOIR.

## TARGETING OF QUICK DEPORTS

INS targets those criminal aliens in prison who are likely to be easily deported-so-called "quick deports." These "quick deports" are predominately Mexican or Central American nationals, who are in the U.S. illegally and have usually been convicted of drug offenses. This policy, while substantially inflating INS deportation statistics, serves as an ineffective revolving deportation door for many criminal aliens. Although a 1992 report to Congress reported that INS agents encountered and arrested only 461 criminal aliens who had re-entered the U.S. in fiscal year 1991 after deportation, the Subcommittee believes that the number of such re-entries is many times higher because of the problems with the system outlined below.

Since deported criminal aliens are unlikely to be sanctioned if they reenter the U.S. after deportation, "quick deports" too often become "quick returns." This problem is compounded by the fact that many U.S. Attorneys are reluctant to prosecute criminal aliens for re-entry after deportation. Moreover, as previously mentioned, criminal aliens often confuse the INS with their use of multiple aliases. Further, it is unlikely that criminal aliens who re-enter the United States will be identified even if they use their real names because frustrated INS officials run no checks on most aliens apprehended at the Mexican border. The upshot is that deportation is too often at worst an inconvenience for criminal aliens, and at best a free trip home for a short visit before they return to the U.S.

The Institution Hearing Program (IHP) as it is currently conducted, targets these individuals as quick deports.

The EOIR has eligibility criteria to determine which criminal aliens will have their removal cases heard in the IHP. These criteria serve to weed out contested

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

or complicated removal cases. With the IHP focused on quick deports, a single immigration judge can easily adjudicate large numbers of cases in a short period of time.

The IHP hearings observed by Subcommittee staff typically involved less than five minutes each. The immigration judge has the criminal alien identify himself, informs the criminal alien of the charges against him or his rights, gives the criminal alien the opportunity to make objections and then, when no objections or motions are made, orders the criminal alien deported. A significant percentage of criminal alien deportations are of criminal aliens who do not contest their deportation and in many cases even wish to be deported.

Once the INS receives travel authorization from the country to which the criminal alien is being deported, the alien is transported to that country at INS expense. Mexican nationals ordered deported through the IHP at California's Donavan State Prison, conveniently located a few miles from a Mexican border checkpoint, are loaded in buses, driven to the checkpoint and handed over to Mexican authorities or simply released into Mexico.

Given the inadequacies of the INS record system, even if a deportee is arrested by the Border Patrol for border jumping, or attempting to cross the border illegally, it is very unlikely that the Border Patrol would be able to identify the alien as a recent deportee. Moreover, since many federal prosecutors, particularly along the Southwest border, limit the number and types of individuals they will consider for prosecution for the crime of re-entry after deportation, there is little deterrence to re-entry even if a deported alien is unlucky enough to be arrested and properly identified. Furthermore, even when such prosecutions are undertaken, they are typically plea bargained down substantially from the 15-year maximum sentence which Congress has provided for re-entry after deportation.

The case of Manuel Castillo-Catalan is an example of how "quick deports" are often also "quick returns." Catalan is a Mexican national who was first deported in 1984 after serving seven years for second degree murder. Catalan did not contest his deportation. After being ordered deported, Catalan was driven by bus to a Mexican border town. Catalan returned to the U.S. one week later, was arrested a short time after returning, and was deported a second time in 1984. Catalan was again driven to the same Mexican border town from which he had returned to the U.S.

In 1989, Catalan was arrested on a narcotics charge. After spending several years in a California prison, he was deported for a third time on June 26, 1992. Catalan had not contested his deportation and was again driven to the Mexican border. On June 27, 1992, Catalan returned to the U.S. In December 1992, Catalan was arrested and for the first time was charged with the crime of re-entry after deportation, and is now serving a sentence of 57 months.

Another example of the "quick deport, quick return" problem is Richard Simons, a criminal alien who testified before the Subcommittee. [FN46] Simons is a 26 years old Canadian citizen who has been deported 3 times. He never contested any of his deportations. Simon first entered the U.S. illegally in 1986. After apprehension and conviction for felony crimes of theft and stolen property, he was deported in 1988. He re-entered the U.S. two months later and was soon arrested in Pennsylvania for forgery. The state sentenced him to 11-23 months for forgery, and the Federal government sentenced him to 6 months for criminal

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT    Document 11    Filed 06/12/2000    Page 67 of 74

re-entry; the re-entry sentence ran concurrently with the longer state sentence. Simons was deported a second time in 1990. Again he re-entered the U.S. about 2 months later. A few months after that, he was arrested for theft, battery and possession of illegal substances. This time he received a 27 month sentence for illegal re-entry. In 1993, he was processed expeditiously through the Oakdale, Louisiana facility at the conclusion of his sentence and was removed from the U.S. a third time early in 1994.

After his first two deportations, Richard Simons testified that he and his friends travelled with impunity across the border into the U.S. many times. Following both deportations he returned to the U.S. intending to remain here indefinitely, and each time he committed numerous felony crimes. He testified that he does not intend to return again because he expects that if he is convicted of criminal re-entry another time, the sentence will be very long.

By targeting "quick deport" criminal aliens such as Catalan or Simons, INS is able to report deporting significant numbers of criminal aliens. These same criminal aliens-typically Mexican and Central Americans with no lawful U.S. immigration status and long criminal histories-are also the criminal aliens most likely to repeatedly return after deportation. These aliens are part of a revolving door that shows little prospect of actually reducing the number of criminal aliens in the United States. In short, "quick deports" are a sham.

Moreover, there appears to be little reason for the current practice of devoting limited judicial and prosecutorial resources to uncontested deportations. These cases can, and in some jurisdictions are, processed rather conveniently without the alien even being present. In these jurisdictions, aliens simply stipulate in writing that they wish to be deported. This stipulation, the administrative equivalent of a guilty plea, is accepted, and the alien is deported.

Both Judge Armstrong and Judge Fong testified that the "quick deports" heard in IHPs could be handled by written stipulation, freeing judges to hear more complex cases. Texas, for example, used written stipulation because all parties in the District including the Court and the Bar accept the practice. [FN47]

### INABILITY OF INS TO PROCESS CRIMINAL ALIENS FOR DEPORTATION PRIOR TO THEIR RELEASE

INS does not complete the deportation process for a large number of criminal aliens before completion of their underlying sentences which means that the INS has to either detain or release them. The detention option is problematical because it takes up limited INS bed space and because it costs money. Release, on the other hand, is even more of a problem since large numbers of non-detained criminal aliens never show up for their deportation hearings. INS needs to acquire additional detention space or better utilize existing space.

The Immigration and Nationality Act calls for the expeditious removal of criminal aliens. The Act further requires the INS to initiate and complete, to the extent possible, deportation proceedings against aggravated felons before the aliens are released from incarceration for the underlying felony. [FN48] According to the INS, the IHP was established to help comply with this legislative mandate. [FN49]  Many criminal aliens, including those aggravated felons channelled into the IHP, are not fully processed before the release date

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

for their underlying crime.

INS inability to efficiently process criminal aliens is illustrated by problems at the Oakdale, Louisiana federal criminal alien detention and processing facilities. The Oakdale, Louisiana facilities include two federal prisons, a federal prison camp and EOIR and INS offices. One prison (the correctional institution) contains aliens nearing completion of their federal sentences. the other, the detention center jointly operated by the INS and the BOP, confines aliens who have served state prison sentences, but have not yet completed their removal proceedings. The EOIR hears cases from both prisons.

The process begins in Federal prisons across the nation when staff identify deportable criminal aliens and INS issues a detainer. Transfers to Oakdale usually occur at the end of the criminal aliens' sentences-typically no later than 6 months before sentence expiration. [FN50]  The INS staff at Oakdale complete most of the paper work required to deport a criminal alien, and immigration judges hear cases in immigration courts located within the complex. It takes approximately one month to complete paperwork and hear an uncontested case. More complicated cases can take considerably longer. Backlogs have occurred at Oakdale because aliens are often received with less than a month to serve. [FN51] This has slowed the movement of aliens out of the correctional institution considerably, and the INS has had to absorb the expense of detention past sentence expiration.

Ideally, the detention center should receive aliens from state facilities with most of their paperwork completed. In fact, however, aliens arrive at the detention center from states with little case work completed. Although the detention center was not intended to house federal prisoners, it has had to absorb "spill-over" of those alien prisoners who could not be processed at the correctional institution prior to sentence expiration.

The delays stem in large part from INS failure to collect information about the identity of criminal aliens in prisons in a timely fashion because it does not have the manpower required to complete paperwork prior to transferring a prisoner to Oakdale. This point is underscored by the following example. The INS recently gained access to the Federal Bureau of Prison's prisoner data base system, Sentry, which contains data on prisoners' citizenship. Using this system, the INS was immediately able to identify 6,000 additional federal prisoners it was not previously aware of who are eligible for new INS detainers.

Moreover, early identification of alien prison inmates by the INS does not guarantee that the flow of prisoners to the federal complex will take place in a timely fashion or that the INS paperwork will be completed before they arrive. This is not always the responsibility of INS, since some states, upon learning that the INS wants to take custody of a prisoner when the prisoner's sentence expires, may advance the prisoner's release data and turn him over to the INS sooner than expected.

Although normal prison processing routines could be used to identify criminal aliens, state prison officials view alienage determination as a Federal responsibility and often they assign a low priority to the task. As a result many criminal aliens in prison will not be identified unless the INS develops a cooperative relationship with prison officials. In Delaware, for example, contact between corrections officials and the INS is minimal. Upon intake, the prison staff ask prisoners where they were born, and the response is typically

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

accepted-whatever it might be. In contrast, in the federal system, the U.S. Probation Officer prepares a pre-sentence investigation on most federal prisoners. Officers are required to document place of birth and, if there is any doubt about a prisoner's citizenship, probation officers are obliged to contact the arresting agency, the INS, or even INTERPOL to determine alienage.

Exactly what percentage of criminal alien cases are completed prior to release is a matter of some debate. Judge Jere Armstrong testified that in FY 93, EOIR completed 79 percent of criminal alien cases prior to release. [FN52] The statistic is impressive, but as was noted earlier, EOIR targets the simpler cases. GAO's review of this program concluded that only 6 percent of all criminal aliens had hearings before they were released. [FN53] Notwithstanding this debate, the fact that serious logjams in processing criminal aliens cases persist cannot be ignored. The Subcommittee found there are large numbers of criminal aliens detained after their sentences expire who create significant problems for the INS.

## LACK OF INS DETENTION SPACE

Although detaining a criminal alien pending removal proceedings guarantees that the alien will actually appear at those proceedings, this option is often not available due to the INS' chronic lack of detention space. The INS has only approximately 3,500 detention beds for criminal aliens in the entire country and some INS districts are particularly short of detention space. For example, the Pennsylvania district, which also includes Delaware and West Virginia, has only 15 detention beds. The lack of adequate detention space puts extreme pressure on the INS to release, rather than detain, criminal aliens. The INS can, and does, pay county jails to hold its detainees. An additional option is for an INS District to transfer a criminal alien to a federal facility such as the Oakdale detention center. However, INS districts are sometimes reluctant to utilize the transfer option since the transferring district will also transfer its "credit" for a completed deportation to the receiving district. [FN54]

In the majority of cases, the need to detain criminal aliens after they have served their underlying sentences indicates the INS' inability to completely process criminal aliens for removal prior to their release date. This inability has serious ramifications: detention is costly and takes up prison and jail space; and it puts pressure on the INS to release criminal aliens, which greatly increases their chances of evading removal.

According to the GAO 1992 investigation of detention capability, INS' planned expansion of detention space, from 6,259 to 8,600 beds by 1996, would not significantly alleviate the shortage. GAO concluded that release determinations are made by the INS in large part, according to the number of beds available in a particular region. [FN55]

## RELEASE OF CRIMINAL ALIENS

Many criminal aliens who are released pending their deportation never appear for their deportation proceedings. In fact, over 20 percent of non-detained criminal aliens do not appear for their deportation proceedings. As of 1992, the INS reported to Congress that some 10,875 aliens convicted of aggravated

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

felonies had failed to report for deportation proceedings. It appears that the INS makes limited efforts to located and arrest those criminal aliens who fail to appear. Although some aliens are ordered deported in absentia, [FN56] deportation cannot be effectuated until the alien is apprehended.

Some criminal aliens abscond after being issued a final order of deportation. Under the INS practice, undetained criminal aliens who have been ordered deported are notified that they have 72 hours to report for deportation. This notice is often referred to by INS officials as the "run notice" since, as one would expect, criminal aliens who have received written notices to report for deportation often fail to appear for their actual deportation. In New York, for example, in fiscal year 1993, out of 1695 such notices to surrender sent to criminal and non-criminal aliens, 1486, or 87.7 percent failed to surrender. Also, in New York, there were $2.4 million in bonds breached in fiscal year 1993. Table 2 shows the number of criminal aliens physically removed has been less than the number ordered deported for each year since 1989. Although the number of deportations has risen steadily, the number of actual physical removals has increased less precipitously, yielding a total of 18,641 criminal aliens who have been ordered deported but were not physically removed.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

INS officials testified that the reason for the 72-hour "run notice" is humanitarian; it allows undetained criminal aliens to complete any final necessary arrangements prior to their deportation. The notice is a creature of regulation within the INS and can be changed. [FN57]  Judge Fong testified that the notice practice needs to be reexamined. He testified that he frequently received "motions to reopen" cases from aliens who had previously received the 72 hour notice. Such motions indicated that the alien had not been physically removed, even though the alien's removal had been ordered. [FN58]

The INS needs to improve the use of detention bed space they already have for criminal aliens, and the way they project future bed space needs. For example:

At a Hearing before the House Committee on Government Operations in mid-1993, Justice Department Inspector General Hankinson gave several illustrations of how INS' detention planning is ill conceived and wasteful. In 1991, for example, the INS paid $28 million for non-INS detection facilities even though considerable bed space was available at facilities the INS operates. [FN59]

Tranfers of criminal aliens across districts are not routine because of difficulties INS has arranging and paying for prisoner transportation. There is also the related matter of transferring deportation "credit," which was noted above.

A 1992 GAO investigation of detention space revealed that serious problems exist in the way the INS projects bed space needs. Inaccurate projections will actually yield serious bed space shortages in 1996 according to the GAO. [FN60]

While the INS may need extra resources for detention space, it has to improve the way it manages existing resources if requests for additional resources are to be considered credible. Adding detention space and better use of existing space would ameliorate many problems associated with early release of criminal aliens including: there would be fewer "failures to appear" and fewer would abscond after receiving deportation orders; the 72-hour "run notice" would be unnecessary; and it would be unnecessary to expend resources locating fugitives or contracting for bed-space. [FN61]

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

Case 1:00-cv-00702-WWC-PT   Document 11   Filed 06/12/2000   Page 71 of 74

CURRENT PROCEDURES ALLOW DELAY AND ABUSES OF DEPORTATION PROCESS BY CRIMINAL ALIENS

Criminal aliens who wish to contest their deportations have a host of avenues by which to do so. As Figure 3 shows, the deportation process for criminal aliens is byzantine to say the least.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

Some criminal aliens attempt to prevent their deportation by filing an asylum claim at some point before, during or after their deportation hearing. In 1992, out of 8,273 IHP cases alone, 219 criminal aliens filed asylum claims. The filing of an asylum claim starts a separate process that can easily take years to resolve.

One of the most common forms of relief from deportation sought by criminal aliens are so-called section 212(c) applications. [FN62] Under section 212(c), criminal aliens lawfully admitted for permanent residence who have been in the U.S. for seven years, and who have not served a sentence of five years or more for a felony, can be granted relief from deportation. Time spent incarcerated is often included as part of the seven year U.S. residence requirement under this section. In 1992, out of 8,273 IHP cases alone, 1,015 criminal aliens made section 212(c) claims. Judge Armstrong acknowledged that 212(c) petitions could be simplified and the process expedited, and Judge Fong testified that having time spent incarcerated count toward the residency requirement should be "reexamined." [FN63]  Both Judge Fong and Judge Armstrong testified at the Hearing that 212(c) is one area where immigration law, in their opinion, can and should be simplified. [FN64]

Criminal aliens also seek to avoid deportation under section 243(h)(1), which provides that a criminal alien cannot be deported if the alien's life or freedom would be threatened in the country where the alien is to be deported on account of race, religion, nationality, membership in a particular social group, or political opinion. Those aliens determined to constitute a "danger to the community of the United States," are not eligible for relief under this provision.

STATE AND LOCAL NON-COOPERATION WITH THE INS

Essential to any effective governmental response to the criminal alien problem is cooperation among law enforcement authorities at all levels-local, state and federal. However, over the last decade, some local jurisdictions have enacted laws, often referred to as refuge, sanctuary or non-cooperation laws, that prohibit or limit local government employees' cooperation with the INS. For example, in 1986, the Oakland California City Council unanimously adopted a resolution declaring Oakland to be a "City of Refuge," which would serve as a safe haven for refugees from El Salvador, Guatemala, Haiti and South Africa. The resolution instructed all Oakland city employees to "refrain from assisting or cooperating" with the INS relative to alleged violations of the civil provisions of the immigration laws. The resolution further urged that the California State Legislature make California a "State of Refuge." [FN65]

In 1989, the San Francisco California Board of Supervisors approved an ordinance making San Francisco "a City and County of Refuge." Broader than the Oakland resolution, the San Francisco ordinance was not limited to any

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

particular foreign nations. Rather, it generally prohibited the use of "City funds or resources to assist in the enforcement of federal immigration law * * * unless such assistance is required by federal or state statute, regulation or court decision." The ordinance was inapplicable to persons charged with or convicted of felonies. [FN66]

While Los Angeles, California does not have a refuge ordinance, the Los Angeles Police Department (LAPD) does have a policy of not permitting LAPD officers to inform the INS when they come in contact with illegal aliens except in limited circumstances. The LAPD Manual states: "Undocumented alien status in itself is not a matter for police action." [FN67]  Further, according to the LAPD Manual, "Officers shall not initiate police action where the objective is to discover the alien status of a person" and LAPD officers are prohibited from arresting or booking anyone for the crime of illegal entry into the United States (8 USC section 1325). [FN68]

Currently, LAPD policy is to notify the INS only when, "an undocumented alien is booked for multiple misdemeanor offenses, a high grade misdemeanor or a felony offense, or has been previously arrested for a similar offense." [FN69] The LAPD policy is, therefore, to avoid contacting the INS if a suspected alien is involved in any other offense. The LAPD is currently being sued by several organizations that claim it has violated previous court rulings and its own policy by cooperating too closely with the INS. According to the Los Angeles City Attorney's office, the goal of the organizations bringing this lawsuit is to make Los Angeles a sanctuary city.

In California, local jurisdictions that adopted such non-cooperation laws or policies were supported by a 1984 opinion by then-California Attorney General John Van De Kamp that stated:

    There is no general affirmative legal duty in the sense of a legally enforceable obligation incumbent on peace officers and judges in California to report to INS knowledge that they might have persons who entered the United States by violating United States Code Section 1325. * * * [FN70]

More recently, however, the specific question of whether local jurisdictions could adopt sanctuary or non-cooperation laws was addressed by the California Attorney General. On November 2, 1992, California Attorney General Daniel E. Lungren concluded that the supremacy clause of the United States Constitution prohibited local jurisdictions from adopting such laws. [FN71] Moreover, on October 4, 1993, California enacted a statute prohibiting local jurisdictions from preventing law enforcement officers from identifying and reporting to the INS any person suspected of violating the civil provisions of the federal immigration laws. However, this statute only applies in cases of a person arrested and booked for alleged commission of a felony. [FN72]  Thus, the statute apparently would permit local jurisdictions to continue non- cooperation with the INS with regard to all other illegal aliens (such as those charged with or convicted of misdemeanors or those without criminal records, so-called "administrative violators") where sanctioning or non-cooperation laws continue to exist.

Non-cooperation provisions are not limited to California. A Chicago Executive Order dated April 25, 1989, prohibits city officials from investigating or assisting "in the investigation of the citizenship or residency status of any person unless such inquiry or investigation is required by statute, ordinance,

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

federal regulation or court decision. [FN73]  This order appears to effectively prohibit local law enforcement authorities from voluntarily cooperating with the INS in a broad range of activities.

A New York City Executive Order adopted on August 7, 1989 prohibits city officials from transmitting information regarding any alien to federal authorities unless required by law to do so or unless the alien is suspected of engaging in criminal activity. However, the order also specifically instructs law enforcement agencies to continue to cooperate with federal authorities, stating that: "Enforcement agencies, including the Police Department and the Department of Corrections, shall continue to cooperate with federal authorities in investigating and apprehending aliens suspected of criminal activity." [FN74] According to the INS, however, this order still inhibits cooperation from New York City officials regarding administrative violators.

While enforcement of immigration laws is generally a federal responsibility and enforcement of most criminal laws is a state and local responsibility, clearly the two are not mutually exclusive domains. In the current debate regarding U.S. immigration laws, many states and local jurisdictions have been highly critical of what they see as the federal government's inability to effectively police our nation's borders, resulting in a massive influx of criminal aliens. Yet, by adopting non-cooperation laws, local jurisdictions are making effective governmental response to the problem of criminal aliens substantially more difficult. [FN75]

## NON-COOPERATION BY FOREIGN GOVERNMENTS

After a criminal alien has been ordered deported one of the final steps in the process before deportation can be effected is to secure documentation from the country receiving the deportee. Such documentation is typically secured by INS Detention and Deportation Officers through a given country's U.S. embassy or consulate.

INS personnel from several district offices have told Subcommittee staff that some countries are less than cooperative with regard to securing documentation. The country most often cited as a problem in this regard is Nigeria and Jamaica appears to be the second biggest problem country. INS personnel on numerous occasions in widely dispersed geographic areas informed Subcommittee staff that Nigerian and Jamaican consular officers were uncooperative in supplying the necessary travel documentation to allow deportations to take place.

At the Oakdale Federal Detention Center in October 1993 there were 33 Nigerians and 99 Jamaicans out of a total population of 811. The Oakdale Federal Correctional Institute had 101 Nigerians and 61 Jamaicans out of the INS population of approximately 614. These numbers do not include Nigerians and Jamaicans incarcerated in county jails in the area near Oakdale. Yet, from all of those facilities, the INS deported only 54 Jamaicans and 56 Nigerians between January-October, 1993.

Under the Immigration and Nationality Act, the Attorney General has the authority to notify the Secretary of State of any country which, "upon request denies or unduly delays acceptance of the return of any alien who is a national, citizen, subject, or resident thereof * * *." [FN76]  Upon such notification, the Secretary of State in turn is to instruct consular officers in the offending

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works

S. REP. 104-48

country to discontinue the issuance of immigrant visas to nationals, citizens, subjects or residents of the offending country. Apparently, neither the Attorney General nor the Secretary of State has ever invoked these procedures except with respect to certain Communist countries during the cold war period.

At the Subcommittee's hearings, Senator Cohen asked INS Commissioner Meissner why the Attorney General had not requested that the State Department withhold immigrant visas from residents of those countries that failed to provide documents needed to deport criminal aliens. Commissioner Meissner testified that, indeed, such a request had not been made and that to make such a request was an "extreme measure."

## RECOMMENDATIONS

1. Congress should radically simplify the deportation process. Consideration should be given to eliminating distinctions among aggravated and non-aggravated felons, at least for non-resident aliens. INS employees often have difficulty in making these distinctions.

2. Existing immigration law establishes a crime severity threshold that must be exceeded for a person to be deportable-whether the alien is in the U.S. legally or not. The threshold should be reduced so that an alien can be deported following conviction for any felony. Criminal aliens who are in the U.S. illegally should have no relief from deportation available to them if they are convicted of 3 crimes (other than traffic violations).

3. Limited detention space is a fundamental problem confronting the INS and therefore it needs to increase capacity to keep pace with the increasing numbers of criminal aliens. [FN77]

4. Congress should consider eliminating or restricting Section 212(c) and other avenues of relief from deportation for criminal aliens.

5. Consideration should be given to establishing the principle that deportation appeals of criminal aliens will be pursued after deportation has taken place, at least for those aliens who are not permanent residents.

6. Congress should consider requiring that all aggravated felons be detained pending deportation. Such a step may be necessary because of the high rate of no-shows for those criminal aliens released on bond.

7. Congress should require sanctions against local governments that adopt official policies of non-cooperation with INS.

8. The Attorney General should notify the Secretary of State of those countries that deny or delay the acceptance of the return of a criminal alien and consideration should be given to limiting issuance of U.S. visas in such countries.

9. INS should develop and institute a fingerprint based identification system, and a nationwide recordkeeping system for criminal aliens. In light of new initiatives in this area recently announced by the Attorney General, the INS should inform Congress of specific plans (including milestones and completion dates) for the immediate development and speedy deployment of a fingerprint based identification system. [FN78]

10. INS should end the policy of issuing work authorization permits to criminal aliens contesting their deportation.

11. INS should end the 72-hour notice policy for deporting criminal aliens.

Copr. © West 2000 No Claim to Orig. U.S. Govt. Works